**SURAMERICA de ALEACIONES LAMINADAS, C.A., Conductores de Aluminio del Caroni, C.A., Industria de Conductores Electricos, C.A., and Corporacion Venezolana de Guayana, Plaintiffs,**

v.

**The UNITED STATES, U.S. International Trade Commission, and U.S. Department of Commerce, Defendants,**

and

**Southwire Company, Defendant–Intervenor.**

Court No. 88–09–00726.

United States Court of International Trade.

March 15, 1993.

---

**2.** Plaintiff has not alleged that defendant is sub- ject to these Acts.

Arnold & Porter, Patrick F.J. Macrory, Michael Faber, Claire E. Reade, Shearman & Sterling, Thomas B. Wilner, Jeffrey M. Winton, for plaintiffs.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, M. Martha Ries Michael Kane, Lynn M. Schlitt, Gen. Counsel, U.S. Intern. Trade Com'n, Robert H. Brumley, Gen. Counsel, U.S. Dept. of Commerce, for defendants.

Wigman, Cohen, Leitner & Myers, P.C., Victor M. Wigman, Ralph C. Patrick, Doro-thy H. Patterson, Mckenna, Conner & Cuneo, Peter Buck Feller, Lawrence J. Bogard, for defendant-intervenor.

Baker & McKenzie, William D. Outman II, Arthur L. George, for Gen. Elec. Co., Amicus Curiae in support of plaintiffs.

## MEMORANDUM OPINION AND ORDER

MUSGRAVE, Judge.

Plaintiffs, Suramerica de Aleaciones Laminadas, C.A. ("Sural"), Conductores de Aluminio del Caroni, C.A. ("Cabelum"), Industria de Conductores Electricos, C.A. ("Iconel") and Corporacion Venezolana de Guayana ("CVG") seek review of the determination of the U.S. Department of Commerce, International Trade Administration ("Commerce" or "ITA") resulting in antidumping duties assessed against them. Plaintiffs also seek review of the determination of the U.S. International Trade Commission (the "Commission" or "ITC") that an industry in the United States is threatened with material injury by reason of imports from Venezuela of electrical conductor aluminum redraw rod ("EC rod" or "rod"), which the Department of Commerce has determined are being subsidized and sold at less than fair value ("LTFV").

The administrative determinations made by Commerce under review are *Certain Electrical Conductor Aluminum Redraw Rod from Venezuela (Final Affirmative Antidumping Duty Determination)*, 53 Fed. Reg. 24755 (June 30, 1988) and *Certain Electrical Conductor Aluminum Redraw Rod from Venezuela (Final Affirmative Countervailing Duty Determination)*, 53 Fed.Reg. 24763 (June 30, 1988). The administrative determination made by the ITC is based upon the record developed in the following investigations: *Certain Electrical Conductor Aluminum Redraw Rod from Venezuela*, Invs. Nos. 701–TA–287 (Final) and 731–TA–378 (Final), USTIC Pub. 2103 (Aug.1988).

### Background[1]

The relevant industry consisted of seven U.S. producers of EC rod and wire and cable

---

1. For a detailed description of the background to this case as well as administrative procedures,

at the time of the petition: Alcan Aluminum Corp. ("Alcan"), Aluminum Company of America ("Alcoa"), Essex Wire and Cable ("Essex"), Kaiser Aluminum and Chemical Corp. ("Kaiser"), Noranda Aluminum, Inc. ("Noranda"), Reynolds Metal Company ("Reynolds") and Southwire Company ("Southwire"). Of these seven, Kaiser and Noranda left the wire and cable business during the period of investigation, leaving a total "industry" of five producers. *Staff Report*, ITC Doc. 21, List 2, at A–29–A–31.

On July 14, 1987, Southwire filed petitions with Commerce and the ITC alleging that electrical conductor redraw rod imported into the United States from Venezuela was being subsidized and sold at less than fair value. Southwire further alleged that sales of this product were causing material injury or a threat of material injury to an industry in the United States.

Plaintiffs, Sural, Cabelum, and Iconel challenged the final determination of the ITC pursuant to 19 U.S.C. § 1673(2)(A)(ii) (1982) that an industry in the United States is threatened with material injury by reason of imports of EC Rod from Venezuela, and the determination of the ITA of sales at less than fair value pursuant to 19 U.S.C. § 1673d(a) (1982). This Court held that Southwire did not have standing to file its petition on behalf of the industry, because Southwire was not a majority producer in the industry and no other company in the industry supported the petition, and because one major domestic producer, along with the union representing EC rod workers and the Aluminum Trade Council, *challenged* the petition. *See Suramerica de Aleaciones Laminadas, C.A. v. United States,* 14 CIT 560, 746 F.Supp. 139 (1990). The Court of Appeals for the Federal Circuit reversed, holding that Commerce could proceed with investigations based on the Southwire petition so long as the majority of industry did not affirmatively oppose it. *See Suramerica de Aleaciones Laminadas, C.A. v. United States,* 14 CIT 560, 746 F.Supp. 139 (1990), *rev'd and remanded,* 966 F.2d 660 (Fed.Cir.1992). The case is now

before this Court on its merits, pursuant to plaintiffs' original motion for review of administrative determinations upon the agency record under Rule 56.1.

In challenging the affirmative determinations and the outstanding orders, plaintiffs assert the existence of several procedural and substantive flaws in the administrative proceedings and resulting determinations below. Plaintiffs allege that the finding by the ITC of a threat of injury to United States producers of like products from imports of EC rod from Venezuela was "based in part on last-minute allegations submitted in violation of the Commission's Rules and without opportunity for rebuttal." *Plaintiffs' Memorandum in Support of Motion for Judgment on the Administrative Record* ("Plaintiffs' Brief") at 39. Plaintiffs also argue that the affirmative threat-of-injury determinations were "erroneous as a matter of law" in that the supporting factual findings allegedly are conjectural. *Id.* at 43. *See* 19 U.S.C. § 1677(7)(F)(ii). Additionally, plaintiffs argue that Commerce's "finding that Sural's sales were made at less-than-fair-value prices was incorrect" in that Commerce improperly rejected information supplied by Sural, relying instead on "best information available" ("BIA"), and made "additional clerical and factual errors." *Id.* at 70–84. Finally, plaintiffs argue that the countervailing duty determination was unjust because the net effect of the subsidy—a preferential exchange rate—did not raise plaintiffs' mandatory exchange rate above the free market rate.

The Court need not decide the propriety of Commerce's determination because this Court rejects the ITC's threat of injury finding. This case is remanded to the ITC for a further explanation of how it arrived at its conclusions in the ITC Final Report; or in the alternative, a rescission of its finding of threat of injury.

## Standard of Review

■ In reviewing injury, antidumping, and countervailing duty investigations and determinations, this Court must hold unlawful any determination unsupported by substantial ev-

*see Suramerica de Aleaciones Laminadas, C.A. v. United States,* 14 CIT 560, 746 F.Supp. 139 (1990).

idence on the record or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1982). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed 456 (1951) (*quoting Consolidated Edison Co. v. Labor Board*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). "This is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 619–20, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131, 141 (1966) (citations omitted); *See also, Matsushita Electric Industrial Co. v. United States*, 750 F.2d 927, 933 (Fed.Cir.1984). The court may not substitute its judgment for that of the agency when the choice is between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*. *American Spring Wire Corp. v. United States*, 8 CIT 20, 22, 590 F.Supp. 1273, 1276 (1984) (*citing Universal Camera*, 340 U.S. at 488, 71 S.Ct. at 465), *aff'd sub nom., Armco, Inc. v. United States*, 760 F.2d 249 (Fed.Cir. 1985).

■ Moreover, substantial evidence supporting an agency determination must be based on the whole record. *See Universal Camera Corp.*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). The "whole record" means that the court must consider both sides of the record. It is not sufficient to examine merely the evidence that sustains the agency's conclusion. *Id.* In other words, it is not enough that the evidence supporting the agency decision is "substantial" when considered by itself. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. *Universal Camera Corp.*, 340 U.S. at 478, 488, 71 S.Ct. at 459, 465.

The precise way in which courts review agency findings cannot be imprisoned within any form of words; new formulas attempting to rephrase the old are not likely to be more helpful than the old. There are no talismanic words that can avoid the process of judgment. *Universal Camera Corp.*, 340 U.S. at 489, 71 S.Ct. at 465.

### Threat of Material Injury

■ The Commission makes its determinations regarding the existence of a threat of material injury to domestic industry based on the record developed in the subject investigation pursuant to sections 705(b) and 735(b) of the Tariff Act of 1930, 19 U.S.C. § 1671d(b) and § 1673d(b). This Court must be especially vigilant of the *threat* of material injury determination mechanism because the Commission's inquiry by its very nature endeavors to predict events that have not yet occurred. *Cf. Rhone Poulenc, S.A. v. United States*, 8 CIT 47, 50, 592 F.Supp. 1318, 1321 (1984) (threat of injury arises in an area of the law which is far from "cut and dry").

■ In order to make a final affirmative determination in its injury investigation, the ITC must find that an industry in the United States: (1) is materially injured or (2) is threatened with material injury or (3) the establishment of an industry is materially retarded, by reason of the imports being sold or likely to be sold at LTFV. *See* 19 U.S.C. § 1673d(b)(1) (1982). Any determination by the Commission that an industry in the United States is threatened with material injury shall be made on the basis of evidence that the threat of material injury is "real and that actual injury is imminent." 19 U.S.C. § 1677(7)(F)(ii) (1982 & Supp.1992); *Cf. Republic Steel Corp. v. United States*, 8 CIT 29, 41, 591 F.Supp. 640, 650 (1984) ("The essence of a threat lies in the ability and incentive to act imminently."). Moreover a determination "may not be made on the basis of mere conjecture or supposition." 19 U.S.C. § 1677(7)(F)(ii) (1982 & Supp.1992). The statute sets forth a series of factors the Commission is to consider in analyzing the issue of threat of material injury. 19 U.S.C. § 1677(7)(F). Among relevant factors in this section are the following:

(I) if a subsidy is involved, such information as may be presented to it by the administering authority as to the nature of the subsidy (particularly as to whether the

subsidy is an export subsidy inconsistent with the Agreement),

(II) any increase in production capacity or existing unused capacity in the exporting country likely to result in a significant increase in imports of the merchandise to the United States,

(III) any rapid increase in United States market penetration and the likelihood that the penetration will increase to an injurious level,

(IV) the probability that imports of the merchandise will enter the United States at prices that will have a depressing or suppressing effect on domestic prices of the merchandise,

(V) any substantial increase in inventories of the merchandise in the United States,

(VI) the presence of underutilized capacity for producing the merchandise in the exporting country,

(VII) any other demonstrable adverse trends that indicate the probability that the importation (or sale for importation) of the merchandise (whether or not it is actually being imported at the time) will be the cause of actual injury....

■ Further guidance is provided by section 1677(7)(A)–(C) regarding material injury. Material injury means harm which is not inconsequential, immaterial, or unimportant. 19 U.S.C. § 1677(7)(A) (1982 & Supp.1992). "The factors required to be considered in a final determination of present injury must be reviewed in the threat of injury context to determine the imminence of actual injury." *Rhone Poulenc,* 592 F.Supp. at 1323. Accordingly, the Commission assesses the volume and consequent impact of imports,[2] as well as the condition of the affected domestic industry.[3] *See Report of the Commission ("Final Report"),* ITC Doc. 115, List 1, at 5; 19 U.S.C. § 1677(7)(C) (1982 & Supp.1992).

■ Finally, the absence of any *indicia* of *present* injury is not considered conclusive that *threat* of injury does not exist. *Rhone Poulenc,* 592 F.Supp. at 1323–24 (*citing* H.Rep. No. 317, 96th Cong., 1st Session 47

(1979)). Moreover, the "threat with regard to one or two factors may so persuade the Commission of threat of injury that the absence of one or another will be no bar to a finding of the requisite threat." *Rhone Poulenc,* 592 F.Supp. at 1324; *See* 19 U.S.C. § 1677(7)(E)(ii) ("The presence or absence of any factor which the Commission is required to evaluate ... shall not necessarily give decisive guidance with respect to the determination by the Commission....")

■ In fact, section 1677(7)(E)(ii), entitled "Standard for determination," was included under the sub-section concerned with *material injury* and not under the sub-section regarding *threat of material injury* found in paragraph (F) of 19 U.S.C. § 1677(7) ("Basis for Determination"). This Court could hold that the liberal standard for determination of material injury does not apply to threat cases. The Court believes, however, that the general principle that the Commission need not come to an affirmative determination on each and every potential factor listed for consideration is equally sound in threat of injury cases. Nonetheless, the Court need not show that each Commission finding on each factor is not based on substantial evidence so long as the Court finds that the sum total of the Commission's findings do not rise to the level of substantial evidence of injury or threat of injury.

### Analysis

The Final Report notes that "the statutory factors deal primarily with what is likely to occur with respect to imports. In order to determine whether that projection about future imports 'threatens' the domestic industry, it must be analyzed in the context of the condition of the industry." *Final Report,* List 1, at 16 n. 46 (noting comments of Commissioner Rohr). The Court agrees. Unfortunately, the Commission did not assess the industry as a whole, and failed to take into account the perspective of industry leaders. Instead the Commission adopted the point of view of a sole company, Southwire, that alone stood to gain an increasingly

---

**2.** 19 U.S.C. § 1677(7)(B).

**3.** 19 U.S.C. § 1677(7)(C)(iii).

firm grip on the domestic EC rod market as other U.S. producers scaled back.

The extraordinary circumstances of this petition merit more than the cursory mention they received in the Final Report. Indeed, such an inquiry is indispensable if the condition of the domestic industry is to be accurately assessed—an assessment critical to an accurate determination of threat of injury, as the Commission majority itself pointed out.[4] As discussed *infra*, when the record is viewed as a whole, it does not substantially support the conclusion that the domestic industry is threatened by—or in the Commission's words is "vulnerable" to—Venezuelan imports of EC rod. *Final Report*, List 1, at 11. On the contrary, the "industry [is] dynamic, with a recent history of retrenchment as a result of economic conditions having nothing to do with imports." *Final Report*, List 1, at 35 (Views of Commissioner Brunsdale, Dissenting).

In assessing the condition of the domestic industry, it is helpful to begin with a description of the product.[5] Electrical conductor (EC) aluminum redraw rod, is a solid round product that is long in relation to cross section, and 0.375 inch or greater in diameter. EC rod is an intermediate product between primary aluminum and finished aluminum wire and cable. Aluminum wire and cable is used mainly to transmit electric current over long distances. Because aluminum wire and cable has significant advantages over the only other economically viable metal conductor of electricity (copper), there is at present no adequate substitute for the finished product.

The domestic EC rod manufacturers are predominantly vertically integrated producers. In addition to EC rod mills, they typically operate aluminum smelters and/or aluminum wire and cable production facilities, and a number of them also produce other aluminum products. The value added in the production of these other aluminum products tends to be higher than in the production of EC rod.

In the chain of production, hot raw aluminum is poured from the smelter to the rod mill for rolling before it has a chance to cool. The hot metal is water cooled and then squeezed through rollers to form the finished EC rod. Some manufacturers who are unable to obtain smelted hot aluminum are equipped to reheat cold aluminum to supply their EC rod mills. EC rod is then drawn to produce electrical cable or wire.

During the period of electrification of the United States, the demand for aluminum wire and cable and for the EC rod from which it is made was strong. The electrification process was substantially completed in the early 1980s. Since then, the demand for aluminum wire and cable has been limited to the replacement and repair of existing equipment and secondary uses such as housing and construction.[6] As early as 1981, U.S. aluminum companies began a systematic shift from the production of EC rod and aluminum wire and cable to the production of other aluminum products.[7] Since then, and with greater frequency since 1984, EC rod mills and aluminum wire and cable production facilities have been idled or sold. During the 1984–87 period, the annual production capacity in the domestic EC rod industry declined from 519,842 short tons to 466,920 short tons, and total apparent domestic annual consumption decreased from 408,295 short tons to 346,842 short tons. The decline in capacity reflects the net of EC rod mill expansions and closures during this period, and the decline in apparent consumption reflects the decrease in demand for wire and cable.[8] Significantly, these statistics indicate that the decline in capacity began before the 1985 increase in Venezuelan imports of which peti-

---

4. *See also Final Report*, List 1, at 35–36 (Views of Commissioner Brunsdale, Dissenting) (describing the procedure and purposes of the Commission's industry assessments).

5. The Court quotes freely from the uncontested factual material developed in the record below without attribution.

6. *Staff Report*, List 1, at A–2–A–3, A–56–A–58.

7. *See Staff Report*, List 1, at A–21, A–17 (table 2, n. 2).

8. *See Staff Report*, List 1, at A–26–A–28.

tioner complains.[9] The record does not contain substantial evidence that the Venezuelan imports have affected this trend. Accordingly, no material injury was found by the ITC for this period. Indeed, non-petitioning domestic companies have cooperated with the Venezuelans, selling off excess U.S. capacity to the Venezuelans as the domestic producers scaled back.

In regard to the condition of the U.S. industry, the ITC in its report found that production of aluminum rod declined from 363,275 tons in 1984 to 279,173 tons in 1986 and increased to 288,785 in 1987.[10] Moreover, the ITC noted that interim production in 1988 was also increasing, with the *caveat that interim figures could be very misleading*.[11] The ITC report finds that "performance is still substantially below 1984 levels ..." and that consequently the domestic EC rod industry remains vulnerable to the threat of unfairly traded EC rod from Venezuela.[12] The ITC never properly explained why 1984 should be the benchmark of health in the industry throughout the period of investigation.

According to the record, the high level of production in 1984 was based on several misconceptions on the part of the industry, including the suppositions that demand would increase and the cost of aluminum would continue to rise.[13] This in turn led to a market "crash" in 1985 and the EC rod producers began to respond more realistically to actual conditions in the industry thereafter. 1984 was not the absolute measure of health in this retracting industry but rather a cyclical high in a decade of long-term retraction of domestic producers from the Industry. When the Venezuelan imports are analyzed in view of the longer term economic trend through 1987, their impact, if any, is far less dramatic.

During 1983, as prices were strengthening, reflecting stronger demand, producers increased capacity utilization to meet the then current demand and the then current forecast of higher demand. The trend towards higher demand, however, did not continue. Producers continued making metal in spite of lower demand. Consequently, inventories rose and prices fell. For example, the Metals Week market price fell from the 80 cent range at the end of 1983 to the mid 40 cent range toward the end of 1984.[14]

At this point, the U.S. industry, faced with severe losses, accelerated rationalization.[15] Production was cut back drastically and capacity utilization was reduced on a worldwide basis.[16] Subsequently, excess inventories have been consumed and demand outpaced renewed production. Additionally, integrated companies have logically chosen to allocate scarce smelted hot aluminum to products with higher profit margins than EC rod; that entailed abandoning EC rod capacity. No single U.S. company, including petitioner, has contended that it has the ability or desire to satisfy U.S. demand today. The record shows that U.S. producers and purchasers turned to the next logical source of supply—the Venezuelans.[17]

The cause of the decline in production capacity is clearly linked to the decrease in demand for aluminum wire and cable. Historically, over two-thirds of EC rod production has been captive production for use in wire and cable facilities owned by the same company that operated the rod mill. Such

---

**9.** *See also* ITC Rec., List 1, Doc. No. 114 at 63–64 (Statement of Mr. Fellers).

**10.** ITC *Final Report,* List 1, at 7 (*citing Staff Report,* List 1, at A–46 (table 4).

**11.** ITC *Final Report,* List 1, at 7, n. 16. Nonetheless, when the interim figures *did not* contradict the ITC's findings, the Commission used them freely. *See e.g., Final Report,* List 1, at 7, 9–10, 14.

**12.** *Id.* at 11.

**13.** ITC Doc. 114, List 1, at 96–98.

**14.** *Id.*

**15.** Rationalization is an economic term of art that has been used in the context of this case to refer to the process of cutting back inefficient production and re-allocating limited supplies of raw materials to more profitable operations.

**16.** ITC Doc. 114, List 1, at 96–98.

**17.** *Id.* at 86–88 (Statement of Mr. Robertson, Corporate Contracting Agent, Aluminum, General Electric).

intracompany shipments decreased by 27 percent volume units from 1984 through 1987, reflecting the contraction in demand for wire and cable in the United States and the discontinuance of wire and cable manufacturing by some of the EC rod manufacturers.[18] In sharp contrast, domestic shipments of EC rod to unrelated purchasers increased by 34 percent during the period.[19] These data indicate that the decline in production of EC rod is directly related to the decrease in demand for wire and cable. Despite the decrease in demand for wire and cable, the process of rationalization engaged in by the U.S. industry before the Venezuelan imports impacted upon the domestic market gave rise to a shortage of EC rod in the mid and late 1980s. Not only were the Venezuelans chosen as the most economical source of EC rod to make up for the shortfall, but the very company that now brings the petition in this case, Southwire, the sole petitioner, was responsible for facilitating and managing the majority of those initial Venezuelan imports.

The record shows the health of the rod industry since the initiation of the petition is in part due to the overall boom that the aluminum industry has been enjoying since 1986. Aluminum prices have increased from 55 cents in early 1987, to the $1.20 range by the termination of the investigation. Prices went up because rising demand caught up with the shrinking production capacity resulting from the industry's rationalization of capacity in the early and mid 1980s.[20]

The financial data relating to the EC rod industry show a decline in most financial indicators during 1985, followed by consistent upward movement thereafter.[21] Gross profits and operating income are difficult to assess because of the predominance of intracompany transfers in the data. Vastly different results are achieved depending on whether the integrated producers value primary aluminum and EC rod captive sales at cost,[22] or, in the alternative, whether they value primary aluminum and EC rod at market prices.[23] The financial data in this record, whether cost or market analysis is used, indicates that the EC rod industry has been consistently profitable.[24]

The record reflects that the divergence between the two accounting methods of computation is the result not of wide fluctuations in the market price for EC rod, but of the fact that "[t]he metal value [of primary aluminum] generally accounts for over 85 percent of the total selling price of the rod and therefore fluctuations in this value strongly influence the final price. During the period of investigation, there has been a wide swing in the metal value." *Staff Report*, List 1, at A–54. This economic reality undermines several of the conclusions that the Commission relied upon to bolster its affirmative finding of a threat of injury to the U.S. industry.

■ First, the ITA concluded that the Venezuelan rod was sold at LTFV based in part on low prices in five non-consecutive quarters out of nine quarters. The ITC used that data as evidence of price suppression in the domestic market. ITC *Final Report*, List 1, at 15. In the other four quarters, the

---

18. *Final Report*, List 1, at 38–39 (Views of Commissioner Brunsdale, Dissenting); *see Staff Report*, List 1, at 27–28.

19. *Id.*

20. *See* ITC Doc. 114, List 1, at 144.

21. *See Staff Report*, List 1, at A–36.

22. *Staff Report*, List 1, at A–37 (table 8).

23. *Staff Report*, List 1, at A–39 (table 10).

24. The Court notes, however, that "the financial information available to the Commission in these investigations is limited in value ... because the industry consumes most of the domestically produced EC rod internally." *Final Report*, List 1, at 9. Commissioner Rohr, while siding with the majority, found that the financial data in this investigation was "extremely limited" in value and should be given little weight. *Id.* at 9 n. 23. Commissioner Brunsdale, while dissenting, agreed with the majority that the analysis based on market prices was more accurate. *Final Report*, List 1, at 40 (Views of Commissioner Brunsdale, Dissenting). However, whereas for the majority these figures merely indicated that the domestic industry was improving yet vulnerable, Commissioner Brunsdale found this data indicative of consistent profitability. *Id.* Under the market price analysis, the industry generated profits during the four years 1984 through 1987 of $8.9 million, $17.4 million, $20.5 million, and $24.6 million, respectively.

Venezuelan rod came in at a *higher* price, resulting in an average sale at less than fair value over the nine quarters of only 0.3 percent. The price comparison by quarter is inconclusive with this narrow differential. *See Tianjin Machinery Import & Export Corp. v. United States*, 16 CIT ——, ——, Slip Op. 92–214, at 13, 1992 WL 406623 (December 1, 1992) (underselling in 15 of 30 quarters is inconclusive).[25] These statistics are not substantial evidence of price suppression, one of the statutory factors the ITC was required to consider and in fact relied upon in making its determination. 19 U.S.C. § 1677(7)(F)(i)(IV).

▉ Second, the Commission's conclusion that the Venezuelan companies could easily obtain the needed primary aluminum on the world market is not supported by substantial evidence, or any evidence for that matter.[26] Commissioner Cass, in his *Additional Views*, found that "[s]upplies of primary aluminum are in short supply, as evidenced by the rapid increase in both spot and near-term futures prices of primary aluminum on world markets throughout the period within which Commerce determined unfair trade practices to exist." *Final Report*, List 1, at 27, *citing Staff Report* at A–57.

Meanwhile, petitioners concede, indeed contend for the purposes of LTFV, that there is a very small profit margin in the sale

of EC rod.[27] Therefore, all extraneous costs of production must be kept as low as possible if a company is to remain competitive. That is why most domestic producers are integrated. That way the aluminum travels the shortest possible distance from the smelter to the EC rod mill.[28]

Obtaining cold metal on the world market then reshipping the processed rod to the United States would presumably add another layer of freight costs to Venezuelan production. Despite Southwire's assertions that freight costs do not become a significant element of the fabrication adder unless the shipment is coast to coast, General Electric ("GE") reported that Southwire itself, because of freight cost considerations, was interested in selling EC rod only to GE's Fort Wayne plant. "In particular, Southwire has declined to supply GE's Shreveport facility and is unwilling to divert more than 20 percent of its GE commitment to North Carolina locations." *Brief of Amicus Curiae General Electric Company in Support of the Plaintiffs' Motion for Judgment Upon the Administrative Record* at 4–8.

Southwire's own conduct contradicts its contention that a difference of 0.02 percent in the price of cable (constructed principally from EC rod) is significant. *See Post Hearing Brief of Southwire* at 7, n. 18. Such a narrow margin for contract awards would

---

**25.** The Court further notes that the "parties state that various sources are used by the industry to set the metal price, and the prices from these sources differ from each other." *Staff Report*, List 2, at A–84. The market rate is constructed based on a survey. *Id.* In view of the fact that the metal price makes up the great majority of the price of EC rod, it is remarkable that prices averaged *within* 0.3 percent over the nine quarters studied.

**26.** In fact, the ITC did not cite any authority or evidence for this proposition. *See Final Report*, List 1, at 14. The ITC has not shown that the Venezuelans have access to world supplies or that production from cold metal is feasible for them. The only evidence this Court could glean from the record on inspection was that at one time one U.S. company, Alcan, that did not have an attached smelter purchased rod on the world market. In fact, Alcan's Williamsport Pennsylvania plant purchased smelted aluminum from its Canadian parent. *Staff Report*, List 2, at A–6. Additionally, [ ] * of Southwire's EC rod pro-

duction is fed by cold metal. *See Id.* at A–34. This evidence is insufficient as a matter of law to establish the viability or probability of Venezuelan purchases on the world market.

* Confidential information deleted.

**27.** *See* ITC Rec., List 1, Doc. 114 at 14. Petitioner contends that a 0.02 percent difference in bids will determine which company wins a contract.

**28.** For example, it was because Kaiser closed its smelter at Chalmotte that its adjacent EC rod mill was closed. *See Post Conference Brief of Sural* at 47 n. 39. Alcoa shut down its smelter at Vancouver, Washington in 1986 and subsequently found that rod production at associated facilities became uneconomical. *Id.* at 49. While several U.S. companies on record considered purchasing aluminum on the world market, all but two concluded that the costs were prohibitive or that it was more economical to buy the rolled EC rod from the Venezuelans. Note that none of these companies besides Southwire recorded their support for the petition.

mean that freight costs are always significant.

Further evidence on the record indicates that the availability of raw aluminum on the world market was illusory. Smelters are presently operating at close to or in excess of 100 percent of their capacity world-wide.[29] Smelting of raw aluminum is necessary before the metal can be fashioned into EC rod. Whether the Venezuelan companies use hot or cold metal, they can only use as much as is smelted.

The Venezuelan companies contend that they do not have the luxury to ship primary aluminum half way around the world and the ITC has not offered any evidence that they have in the past. To the contrary, Sural has [ ] and has offered an explanation for why they would be extremely unlikely to do so imminently. *See Plaintiffs' Memorandum in Support of Motion for Judgment on the Administrative Record* at 49–51; *Staff Report*, List 2, at A–19; *id.*, ITC Doc. 29J, List 2, at 23 [ ]; *id.* at 29 [ ]; *Staff Report*, List 2, at A–19–A–20 [ ] The fact the Venezuelans have turned to increased smelting capacity to the complete exclusion of world market purchases is evidence that the world market purchases, if possible, were not economically feasible. In fact, six out of seven of the U.S. EC rod producers use molten aluminum from an adjacent smelter for their EC rod production, indicating it is the preferred method of production.[30]

As Sural justly points out, "the petitioner never even suggested that Venezuelan EC rod producers could practically obtain in-

creased supplies of aluminum on the world market. It was never an issue. If Sural had any notice that the Commission would consider this issue it would have been able to address the issue and to show that the costs of purchasing aluminum on the world market and importing it into Venezuela are, indeed, prohibitive." [31]

This Court has repeatedly held that a party may not reverse the position it took before the agency and raise contrary arguments on appeal, explaining that "to allow plaintiffs to change their position at this time would deny the Commission the opportunity to review plaintiffs' arguments during the time period prescribed by statute as well as deprive the other parties of their right to respond to plaintiffs' position." *Calabrian Corp., v. ITC,* 16 CIT ——, ——, 794 F.Supp. 377 (1992), *citing Trent Tube Div., Crucible Materials Corp. v. United States,* 14 CIT 386, ——, 741 F.Supp. 921, 929 (1990).

 The same standard applies to the Commission when it raises arguments for the first time in its final reports. Such a position is especially justified in this case where the record is thin with regard to the Commission's finding and the Commission did not permit rebuttal on the issue.

The Court notes that the Commission has compounded the difficulty of the Court's task in resolving the issue of aluminum supplies by not citing to anywhere in the record to support the Commission's finding regarding world market supplies in the Final Report; nor has the Commission even raised the issue before the Final Report. Likewise, the Staff

---

29. ITC Doc. 114, List 1, at 144. The U.S. aluminum producers are currently reported to be operating at 104 percent capacity and cannot satisfy demand. *Id.* at 97.

30. *See Staff Report*, List 2, at A–25–A–36. A former Alcoa official explained that Alcoa closed its antiquated rod rolling mill in Vancouver, Washington, in part because the mill could only use cold aluminum ingot, "in contrast to rod casting mills that use molten aluminum to produce rod and thereby eliminate the handling and preheating step." *See* Statement of Richardson, ITC Doc. 80, List 1, at 2. [ ] *See Staff Report*, List 2, at A–35 and n. 3. Southwire closed its Carrolton, Georgia plant. There was no adjoining smelter to the Georgia facility; it

had to use cold metal to produce rod. *GE's Post Hearing Brief* at 17, ITC Doc. 15, List 2.

31. *Plaintiffs' Memorandum in Support of Motion for Judgment on the Administrative Record* at 51, n. 122. The Staff Report itself notes that "[l]ocating the rod mill near the smelter eliminates the transportation and inventory costs associated with supplying a rod mill with aluminum ingot shipments (cold metal)." *Staff Report*, List 2, at A–5. The report further notes that "[t]he importance of these cost savings can be attributed to the low value added in aluminum rod production—10 percent or less of its total cost—and the significant proportion of its cost attributable to primary aluminum." *Id.*, n. 1.

neglected to address the world supplies of aluminum and instead focused on smelting capacity. For example, a Staff memorandum[32] rebutted the Venezuelan complaints that supplies of aluminum were difficult to obtain not with the suggestion that the Venezuelans could purchase it on the world market, but that the Venezuelans would soon be increasing their smelting capacity.[33]

There is evidence from a variety of sources on the record indicating a severe world-wide shortage of aluminum.[34] Considered with evidence on the record that smelters are working at maximum capacity, this evidence suggests that whatever aluminum (cold metal) is available on world market is quite costly. The added costs of ocean transportation and reheating the aluminum for processing raise further doubts about the viability of obtaining metal on the world market for the Venezuelans. Moreover, even if all these obstacles could be overcome, nothing in the record supports the inference that this world market aluminum would be directed to EC rod production rather than mechanical rod or other higher value-added products.

Logically, scarce raw aluminum, when it does become available, will be directed to the most profitable products with the higher value added; the U.S. experience, based on the record, reflects this. The ITC Staff Report notes the same trend for the Venezuelan companies: They are shifting their aluminum resources to higher value-added aluminum products.[35] In addition, much of the planned capacity is to be used for production of mechanical rod.[36] Given their problems purchasing aluminum at home,[37] if purchasing from foreign sources were a viable option, the Venezuelan producers would likely have done so already.

The Court finds that there is no substantial evidence in the record that world market

supplies of primary aluminum are likely to play a role in feeding the Venezuelans' increased capacity. Without more primary aluminum, the Venezuelans' present increased capacity cannot be utilized and therefore does not rise to the level of a "real and imminent" threat of injury to the domestic industry. The ITC did not address the unrebutted evidence on the record of the severe world shortage of aluminum and the U.S. shortage of EC rod. Until this shortage is remedied, a possible increase in Venezuelan imports will serve merely to fill excess demand, not cause injury to the U.S. industry. In other words, U.S. purchasers of EC rod will have to buy EC rod from a source other than the domestic suppliers to satisfy domestic shortages. So far these purchasers, many of them members of the EC rod industry itself, have chosen to buy from Venezuela.

On remand, the ITC is instructed to explain what evidence, if any, in the record supports its contention that world market supplies of aluminum are readily and imminently available to the Venezuelan producers. The ITC is invited further to explain why, if these supplies have been available and economically feasible, the Venezuelans have never taken advantage of them—even throughout the period of investigation, when the Venezuelans had significant excess capacity and no material injury was found. Because the ITC raised the question of world supplies of aluminum in a conclusory manner, plaintiffs shall be permitted a rebuttal on remand.

In addition to an overview of the domestic industry as a whole, the Court feels compelled, by the peculiar circumstances of this case, to scrutinize the situation of Southwire, the sole petitioner. The Court notes that Southwire, with just [ ] of the U.S. market,[38] is the *only* U.S. company that appears concerned with potential injury to the

**32.** Staff Memorandum on "Pre-hearing Discussion of Elasticities for Certain Electrical Conductor Aluminum Redrew Rod from Venezuela, Investigations Nos. 701–TA–287 (Final) and 731–TA–378 (Final)," June 21, 1988.

**33.** *Post Conference Brief of Sural and Answers to Commission Inquiries* ITC Doc. 16, List 2, at 48.

**34.** *See, e.g.,* ITC Doc. 114, List 1, at 88–89, 96–98, 11, 119–20, 127, 141–144, 146–47.

**35.** *Staff Report,* List 2, at A–13.

**36.** *Id.*

**37.** *Staff Report,* List 1, at A–19.

**38.** *Staff Report,* List 2, at A–24, table 2.

U.S. industry—even though a mere check mark on a Commission questionnaire was all that was required of the other U.S. companies to express such concern. Moreover, as the record indicates, Southwire has been operating at peak capacity [39] with no planned expansion [40] and has been enjoying record profits unparalleled in its 37 year history.[41] These indications of the remarkable health of Southwire are unrebutted anywhere in the record. Yet, the very companies "on whose behalf" Southwire brings this suit are not before the Court and did not support Southwire's petition. Meanwhile, Southwire's counsel took pains to convince the Commissioners at the hearing that it had brought this case not on its own behalf, but rather "on behalf of the domestic industry." ITC Doc. 114, List 1, at 56.

Southwire contends that the industry's reluctance is due to pending business transactions involving the other domestic manufacturers, the international ramifications of which might make domestic producers leery to support the petition. This response, however, supports Commissioner Brunsdale's finding that the domestic industry is engaged in a "dynamic retrenchment that predates and has little to do with the Venezuelan imports at issue." [42] Indeed, if the industry truly perceived a threat of injury from the Venezuelan imports and was inclined to continue EC rod production on an increased scale, it would presumably indicate its support for Southwire's petition.

The record indicates that Southwire's explanation is not the correct one. As the Court noted above, domestic companies began selling off capacity in the early 1980s, long before the Venezuelans arrived in the

U.S. market.[43] It is also noteworthy that when Venezuelan rod appeared on the U.S. market, the party directly controlling the Venezuelan imports was Southwire. Other plants purchased by the Venezuelans from American companies were already being supplied by the Venezuelans or Alcoa (who has also opposed this petition) before the purchases took place.[44]

The Commission accepted that Southwire's sole petition was "on behalf of" and therefore to the benefit of the U.S. industry as whole. The only evidence in the record, however, indicates that this petition is clearly against the interests of the other companies. General Electric ("GE"), a large purchaser of EC rod, has done its own industry survey. The GE testimony provides a valuable insight into how the EC rod industry is actually operating.

Unlike Southwire's version, which is supported by no other party, GE's position is buttressed by the opposition of Alcoa, The Aluminum Trade Council, and the Aluminum Brick and Glass Workers Union. The Department of Commerce refused to consider the position of interested parties not formally part of the EC rod industry for the purposes of standing. Without reaching this issue for the purposes of standing, this Court holds that the stance of agencies and institutions intimately linked to the industry under investigation—such as the Aluminum Trade Council—is relevant to the support for the petition, or lack thereof, as evidence of threat of injury.

GE testified to the Commission that although Southwire was a quality producer, it was unable, and in some cases unwilling, to

---

**39.** ITC Doc. 114, List 1, A–78 (Statement of Mr. Long, Southwire Assistant Vice President, Manufacturing).

**40.** *Id.* at 78–79; *see also Final Report* at 31 (Add'l Views of Commissioner Cass) ("the domestic EC rod industry conspicuously is not now expanding, and apparently lacks any current plans to expand.")

**41.** *Post Hearing Brief of Sural* at 1 (*citing* Southwire February 1, 1988 Press Release).

**42.** *Final Report,* List 1, at 41 (Views of Commissioner Brunsdale, Dissenting).

**43.** GE contends that the present shortage of aluminum is due in part to low supplies world wide. Plant closings at Kaiser (Chalmotte, Louisiana), Essex, and Capital Wire all contributed to the shortage but none were occasioned by imports of Venezuelan rod. ITC Doc. 114, List 1, at 88. For example, the Kaiser facilities were closed in late 1982 and early 1983, before the Venezuelan rod appeared on the market.

**44.** *Plaintiffs' Memorandum in Support of Motion for Judgment on the Administrative Record* at 57.

provide for all of GE's needs.[45] Because GE's purchasing decisions are made on the basis of reliability of supply, pricing, and quality, GE was forced to look elsewhere to ensure adequate supplies for all its production facilities—especially since, in keeping with the industry trend, it had been scaling back production of EC rod since the late 1970s and early 1980s.[46]

Southwire shut down its production facility at Carrolton, Georgia in 1986, in the face of near capacity utilization at its other plants and industry demand in excess of its supply in the mid and late 1980s.[47] Furthermore, as of the time of this petition, Southwire had no plans to expand its capacity by acquiring or purchasing new mills.[48] This additional evidence of industry retraction and inertia explains the industry's reluctance to back the Southwire petition, and the Venezuelan move to increase U.S. sales.

Contrary to Southwire's contention that a narrow margin (0.02 percent) can make or break a contract bid, GE asserts that pricing is not determinative.[49] For example, in 1988, GE paid Southwire 3.4 cents per pound extra to supply rod to Rome, New York rather than developing one of three potential alternate sources. Furthermore, GE paid its major supplier that year a slightly higher rod adder[50] than it paid to its other two suppliers to assure timely delivery as required throughout its total plant system—in other words for "flexibility and dependability of supply."[51]

Mr. Robertson, GE's contracting agent, stated that the Venezuelan companies have not been undercutting or suppressing U.S. prices as far as GE was concerned.[52] Rather, he was gravely concerned that Southwire would be unable or unwilling to supply GE's needs in the future.

GE began developing its supply relationships with Sural in 1983 and Iconel in 1984.[53] GE ran preliminary production trials in 1984 and attempted to scale up its purchases in 1985 with limited success.[54] In 1985, GE purchased 24 percent of its rod from Venezuela and paid a 1.4 percent premium *over* its U.S. producers who supplied the balance of its requirements. In 1986 and 1987, Sural quoted broad adders which were 38 percent higher than those of the U.S. producers and were consequently not awarded any GE business. This evidence further counters whatever other scant evidence of price undercutting or suppression of U.S. prices that exists in the record.

Meanwhile, in 1988, Southwire insisted on switching GE to a higher priced metal base (that of U.S. Metals Week transaction price). That condition was not imposed upon GE by any other supplier, domestic or foreign. GE's contracting agent estimated that Southwire's decision resulted in a 2.4 cent per pound difference in the adder over the first five months of 1988.[55] In addition, Southwire wanted to raise the rod fabrication adder by 58 percent. The combined effect of these two proposed increases would have been to

---

**45.** ITC Doc. 114, List 1, at 82–90 (Testimony of Mr. Robertson). For example, Mr. Robertson reports that in the past, Southwire has expressed an intention to limit its supply to GE's Fort Wayne plant to 20 percent of GE's request.

**46.** *Id.* at 85–90.

**47.** *Id.* at 78–79.

**48.** *See* note 42, *supra.*

**49.** In Southwire's *September 1987 Registration Statement* filed with the SEC, Southwire maintained that price, availability, quality, and reliability played a role in its purchasing decisions. It is hardly credible that a 0.02 percent change in the price is more important than the potential weight of the other factors. *Southwire Registration Statement* on Form S-1, File No. 33–17537. The Staff Report, for example, noted that "freight

allowances of 1 to 1.5 cents per pound are given to any company willing to pick up the rod with their own trucks." *Staff Report*, List 2, at A–83.

**50.** The rod adder fee is the production charge over the charge for the underlying primary aluminum.

**51.** Testimony of Mr. Robertson, ITC Rec., List 1, Doc. 114 at 85.

**52.** *Id.*

**53.** *Id.* at 86.

**54.** *Id.*

**55.** In May alone, the difference was 4 cents. *Id.* at 87.

raise Southwire's price to GE by 100 percent over its 1987 price. Consequently, Southwire "priced itself" out of its 1987 position as 45 percent supplier to GE, to settle at 5 percent.[56] The industry reluctance to support Southwire's petition in the instant matter is more understandable in view of this evidence.

During the period from 1986 to 1988, GE reports that it bought "an estimated 75 million pounds of rod, over half of which has come from its main U.S. supplier over that time, over a third of which has come from Southwire, approximately 8 percent from a third U.S. supplier and only 4 percent from Venezuela," not enough to support a finding of a material threat of injury to Southwire or other U.S. industry members.[57]

### Support as Evidence of Threat

■■■ Southwire, which represents approximately [ ] of the domestic EC rod industry, is the sole petitioner from that industry in this case. The failure of all other members of the industry to support the petition is strong factual evidence that the EC rod imports are not causing a real and imminent threat of injury to the domestic industry.

ITC commissioners have distinguished in the past between industry support for standing and industry support as evidence of injury: "Wholly apart from the issue of standing to maintain a petition . . ., the Commission may conclude under Sections 705(b) and 735(b) that relief is not appropriate where the petition lacks sufficient industry support. There seems to be little dispute about our ability to do so either as a matter of statutory intent or because *lack of industry support is persuasive evidence of the lack of a causal connection between unfair imports and material injury to the domestic industry.*" *Certain all-Terrain Vehicles from Japan,* No. 731–TA–388 (Preliminary), USITC Pub. 2071 (March 1988), Additional Views of Chairman Liebeler and Vice Chairman Brunsdale at 37 (footnote omitted) (emphasis added).

The notion that industry support for standing is a separate question from support as

evidence of injury or threat of injury is consistent with the position taken by the Court of Appeals for the Federal Circuit. *See Suramerica v. United States,* 966 F.2d 660, 665 n. 6 (Fed.Cir.1992). The Court of Appeals for the Federal Circuit has held that the ITC may defer to Commerce's initial determination of support for purposes of pursuing an investigation. *See Id.* The ITC's primary role as delineated by the statute is to determine whether or not there is injury or threat of injury. 19 U.S.C. § 1673 *et seq. See discussion of standard of review, supra.* Therefore, whereas Commerce now determines standing, countervailable subsidies, and sales at less than fair value, the only role left to the ITC is to gather relevant data in the record regarding injury or the threat of injury.

In an opinion relying on *Suramerica v. United States,* 966 F.2d 660 (Fed.Cir.1992), this Court has also distinguished between support as evidence and support for the purposes of standing. *See Minebea Co., Ltd. v. United States,* 16 CIT ——, ——, 794 F.Supp. 1161, 1164–65 (1992) (upholding Commission finding of material injury where majority of domestic spherical plain bearings industry opposed petition), *see Suramerica,* at 665 n. 6.

The *Minebea* Court echoed the Court of Appeals for the Federal Circuit by offering that "questions of the standing of a petitioner to file an antidumping duty petition are to be decided by the ITA alone" in the section of the opinion entitled "Standing." *Minebea Co., Ltd. v. United States,* 16 CIT ——, ——, 794 F.Supp. 1161, 1164 (1992). In a separate section of its opinion entitled "ITC's Injury Determination," the *Minebea* Court rejected the argument of Minebea that there could be no finding of material injury if a majority of the U.S. industry believes that its problems are not caused by LTFV imports. Although the Court noted that Minebea did not challenge the ITC's determination on the basis that it was not supported by substantial evidence, the Court went on to state in *dictum* that, "when the ITC is determining whether LTFV imports are a cause of material injury

suffered by a U.S. industry, the position of any segment of the U.S. industry as to the cause of its difficulties is not something which the ITC is required to consider." *Minebea*, 16 CIT ——, ——, 794 F.Supp. 1161, 1165 (1992), *citing* 19 U.S.C. § 1677(7) (1992).

The Court declines to follow the *dictum* in *Minebea*, and holds that the ITC must consider the position of the domestic industry. While no statute requires a negative finding given the opposition of a majority of the domestic industry, 19 U.S.C. § 1516a(b)(1)(B) requires that an ITC determination be supported by substantial evidence on the whole record. Absent compelling evidence of threat, it is not reasonable to conclude that the domestic industry is threatened when a majority opposes or does not support that finding.

There may be circumstances warranting a finding of injury, even where the majority either does not support or actively opposes the initiating petition, if the independent data clearly support a finding of threat of injury. In that instance the administrative agency would be taking remedial action on behalf of a company or companies instead of the industry. That is, the Commission, by pursuing enforcement, places its judgment above that of the industry—which either opposed the petition or declined to support it—regarding the effect of allegedly unfairly traded imports.

The decision in *Minebea* concerned *material injury* and was made in light of the fact that Minebea did not challenge the ITC's determination on the basis that it was not supported by substantial evidence. In contrast, *Suramerica* concerns *threat of material injury*, 19 U.S.C. § 1677(7)(F) (1982 & Supp.1992), and the heart of the issue is whether the ITC's determination was based on substantial evidence. The industry's position is highly relevant to whether an industry has been injured by imports, and even more relevant to the question of whether an industry that has not been so injured is nevertheless threatened with material injury.

This Court has addressed the scope of the inquiry into the condition of the industry for the purposes of material injury. *See Calab-*

*rian Corp.*, —— CIT ——, ——, 794 F.Supp. 377, 380 (1992). The statute directs the Commission to determine "whether there is a reasonable indication that an industry in the United States is materially injured." 19 U.S.C. § 1671b(a)(1)(A) (1982 & Supp.1992); *Calabrian Corp.*, —— CIT ——, ——, 794 F.Supp. 377, 380 (1992). "Industry" is defined as "the domestic producers *as a whole* of a like product." 19 U.S.C. § 1677(4)(A) (1992) (emphasis added); *Calabrian Corp.*, —— CIT ——, ——, 794 F.Supp. 377, 385. "That Congress intended for the Commission to consider the entire industry is clear from the legislative history of the 1979 Act. Congress endorsed the Commission's practice prior to the passage of the 1979 Act, in which 'the phrase 'an industry in the United States' … has been interpreted by the ITC as referring to all the domestic producer facilities engaged in the production of' the like product." *Id.*, at 385, *citing* S.Rep. No. 249, at 82, 96th Cong., 1st Sess. § 252 (1979), U.S.Code Cong. & Admin.News 1979, at 381, 468; *see Copperweld Corp. v. United States*, 12 CIT 148, 165–66, 682 F.Supp. 552, 569 (1988). There is no reason why this analysis should not apply to inquiry in threat of injury cases. In *Suramerica*, the ITC conducted an inquiry based on allegations of *material injury* and of *threat of material injury.*

Further, section 1677(7)(A) implicitly requires that the ITC consider the position of the domestic industry. Section 1677(7)(C)(iii), entitled "Impact on affected domestic industry" under the subheading. "Evaluation of relevant factors" lists a host of factors including *potential decline in output*, and *potential negative effects on the existing development and production efforts of the domestic industry*. These factors do not exist in a vacuum. They must be considered in light of the industry's perceptions, which inform these indicators and the trends likely to materialize. Section 1677(7)(C)(iii) further states that "the Commission shall evaluate all relevant economic factors." To hold that the consideration of information necessary or relevant to the evaluation of the relevant factors enumerated under section 1677(7)(C) is not required would eviscerate that statutory provision.

In the legislative history to the Trade and Tariff Act of 1984, the Conference Committee acknowledged that "the projection of future events is necessarily more difficult than the evaluation of current data. Accordingly, a determination of threat will require a careful assessment of identifiable current trends and competitive conditions in the marketplace." H.R.Rep. No. 1156, 98th Cong., 2d Sess. at 174 (1984), U.S.Code Cong. & Admin.News 1984, at 4910, 5220, 5291. The position of individual member companies, when the industry is comprised only of large companies which are few in number, is critical to this assessment since domestic industry perception of foreign competition influences current trends.

Moreover, section 1673 contains the fundamental requirement that a causal nexus be established between the allegedly unfairly traded imports and the injury, *i.e.*, that the injury be "by reason of" those imports. 19 U.S.C. § 1673 (1982). The position of the industry at issue, which is the single group with the largest stake in the outcome of the proceeding, is always relevant to determining this causal relationship. Again, in some cases, once the Commission considers relevant lack of industry support, it may still be justified in finding injury. A finding of a threat of injury would be rare because majority opposition or minority support for a industry member petition alleging threat is strong evidence that the threat is not real, imminent, or likely.

The ITC is required to consider the whole record and whatever in the record fairly detracts from its finding. *See discussion, supra, re Universal Camera Corp.* This Court in *USX Corp. v. United States*, 11 CIT 82, 95, 655 F.Supp. 487, 498 (1987) has stated that "[a]lthough ITC is not required to amass every conceivable shred of relevant data in order to comply with the requirements of the law, the absence of information necessary for a thorough analysis may render a determination unsupported by substantial evidence." Likewise, although the Commission need not establish that it considered every shred of evidence to comply with the requirements of the law, its failure to consider relevant information may render a determination unsupported by substantial evidence.

"Absent some showing to the contrary, the Commission is presumed to have considered all evidence in the record." *Rhone Poulenc, S.A. v. United States*, 8 CIT 47, 55, 592 F.Supp. 1318, 1326 (1984). Moreover, the Commission "may, and indeed must, consider all evidence presented which comprises the record," even if it is not contained in the staff report. *Wells Mfg. Co. v. U.S.*, 11 CIT 911, 921, 677 F.Supp. 1239, 1247 (1987). The industry's views in *Suramerica* are not only in the record, they are prominently known to the ITC; therefore, they must be considered.

In conclusion, whereas the position of "any segment" of the U.S. industry may not be specifically itemized in section 1677(7), the implication of the statute, administrative procedure, and the prior holdings of this Court compel the conclusion that the industry support for a petition is relevant and must be considered. In *Suramerica*, the minority support for the petition, and the opposition to it, is relevant to the likelihood of the threat of injury.

On remand, the ITC must consider the industry's position regarding the petition and explain how a finding of threat of injury can be supported despite the decision of the majority of the industry not to support the petition and the lack of concern for a threat of injury as reflected in the ITC questionnaire responses. *See* discussion of responses to ITC questionnaires, *infra.*

As a procedural and evidentiary matter, the absence of industry support for a petition is problematic in a Commission proceeding. Respondents are in effect not allowed to face the "industry" that accuses them. First, the Commission is prevented from fully evaluating the impact of imports on the domestic industry because the industry does not appear at the hearing to support the petition. The Commissioners, therefore, do not have the opportunity to ask important questions. Similarly, the petitioners, as here, can advantageously defer questions to an industry that is not present to answer. More importantly, respondents are denied the opportunity to review and question relevant data on the entire industry. Pursuant to the Commis-

sion's regulations, 19 C.F.R. § 207.7(a), respondents are not permitted to review data provided by those industry members that do not affirmatively support the petition. As a result, the respondents are precluded from presenting a fully informed case.

These concerns are especially warranted in this case. The ITC Staff Report is dotted with second-hand accounts and inferences that various of the other companies did indeed support the petition. *See Staff Report*, List 2, at A–29 & n. 1. For the purposes of support as evidence of injury, the ITC may not infer that industry members support a petition privately, via the Staff to the Commission, and outside the administrative and judicial process, where those companies have declined to indicate their support for a petition on the ITC questionnaire. This Court considers all such references to industry support for the petition, with the exception of Southwire's, improper and inoperative, and must be excluded from consideration upon remand.

Southwire is operating at peak capacity and enjoying record profits. A review of the record, demonstrates time and again how Southwire, as the sole petitioner, is placed in the awkward position of defending as injured the other members of the industry where they have not seen fit to defend themselves. It is anomalous in the extreme that the other companies would not to come forward when, as Southwire asserts, their very existence is at stake. If any other company truly felt real and imminent threat to their position from the Venezuelan imports, surely they would come forward. To ignore a real and imminent threat is to act at one's peril and flies in the face of logic. The total lack of industry support apart from Southwire's in

this case seriously undermines the contention that the industry is in fact threatened.[58]

It is plain from the facts of this case that Southwire has brought this petition not to protect its own operations from injury, which are operating at full capacity, but to erect barriers to potential competitors as established companies leave the industry. "The Company believes it may be able to increase its market share in its core business through internal growth and acquisitions. *Demand for most of the Company's rod wire and cable products currently exceeds the Company's production capacity.* Due to recently announced decisions that certain competitors of the Company are leaving the wire and cable business, or are for sale, management of the Company believes that it may be able to realize increases in market share." [59]

In the domestic EC rod industry, it is known with absolute certainty who the member companies are. Because these companies were all sizable, the ITC had a duty to question them and in fact did so. There were seven large U.S. companies producing EC rod domestically during the period of investigation and they were all solicited.[60] Indeed, [ ]—five of the six other producers of EC rod—stated that they had not experienced any negative effects on growth, investment or ability to raise capital as a result of imports of Venezuelan rod.[61] The sixth stated that it had experienced such negative effects only with respect to its wire and cable operations, and not with respect to EC rod.[62] Four of the six other producers informed the ITC that they did not anticipate any negative impact from imports of EC rod from Venezuela.[63] A fifth noted that it anticipated such a negative impact only with respect to its wire and cable operations.[64]

58. The Staff Report's remarks that the other members of the industry were more concerned about [ ] than they were of Venezuelan imports constitute idle talk that was understandably not addressed by the Commission in its Final Report.

59. ITC Doc. 114, List 1, at 210 (Statement of Mr. Briger, quoting from "page 22 of September 29th prospectus" of Southwire) (emphasis added).

60. *See supra* at 2.

61. *See* Responses to Q.IV.G.1 of the Producers' Questionnaire, ITC Doc. Nos. [ ] List 2.

62. ITC Doc. [ ] at Q.IV.G.1. [ ] List 2.

63. *See* ITC Doc. Nos. [ ] Responses to Q.IV. G.2, List 2.

64. *See* ITC Doc. [ ] Response to Q.IV.G.2 [ ] List 2.

The Commission could find no present material injury based on these scant and admittedly unreliable data; nevertheless, the Commission majority was able to find a *threat* of material injury to the U.S. industry given these circumstances.[65] The fact that not one other member of this industry comprised of a few large powerful companies came out in support of the Southwire petition is compelling factual evidence that the industry itself is not threatened with material injury by imports of Venezuelan EC rod. The additional opposition to the Southwire petition of Alcoa, the Aluminum Trade Council, and the principle union related to the industry buttresses evidence in the administrative record that there is no substantial evidence of a threat to the domestic industry of material injury.

 Significantly, Southwire itself did not view the threat of Venezuelan imports seriously enough to mention them on Southwire's September 29, 1987 registration statement filed with the SEC, which was filed *after* the petition.[66] The absence of any mention of a threat from the Venezuelan imports stands in stark contrast to Southwire's depiction of the industry in its petition.[67]

The record informs the Court that "as a matter of SEC law and practice, facts concerning the effects of competition must be disclosed if those effects either had had, were having, or *could reasonably be expected to have* a material adverse impact on the business of the issuer in the future. SEC regulations specifically require disclosure of com-

petitive conditions in the industry in which the issuer operates, including, where appropriate, an identification of specific competitors." [68]

In the prospectus, Southwire describes itself as one of the largest manufacturers in the United States of copper and aluminum wire and cable for the transmission of electricity. Its strategy is to increase its position as a leader in the core businesses of rod and wire and cable.[69] Although domestic competitors are identified by name, there is no mention of the effect of foreign competition.[70]

Sural further contends that the SEC requires companies like Southwire, who had not previously had a market for their shares, to summarize anything that might affect business or investment potential in one prominent place at the beginning of the prospectus. Southwire complied with this requirement by listing six special risk factors ranging from the volatility of aluminum prices to its own contingent liabilities. Foreign competition was not mentioned.[71]

Sural concludes that "as a matter of SEC law and practice, the allegations made by Southwire about the competitive effects of Venezuelan's EC rod imports are material facts required to be disclosed in a registration statement, if true. No such disclosures were made. The Petitions [*sic*] and the registration statement simply cannot be reconciled." [72]

Southwire's only rebuttal is a brief letter from its attorneys attesting knowledge of the

---

65. Indeed, Commissioner Cass noted this was a "very close call" on the threat issue. *Final Report*, List 1, at 19.

66. ITC Doc. 114, List 1, at 135 (Statement of Mr. Michael Dooley in reference to Southwire Registration Statement, or "Southwire Prospectus" on Form S-1, File No. 33-17537). Although the offering was set for October 19th of that year, the due diligence procedures were performed *prior* to the registration filing in September. The petition was filed in June. *Id.* at 139. The fact that the offering was subsequently withdrawn for other reasons makes Southwire's omission no less significant.

67. For examples of Southwire's pessimistic assessments see ITC Doc. 80, List 1, Statement of Dooley at 8–12 (*citing* Antidumping Petition of Southwire).

68. ITC Doc. 114, List 1, at 135; *see* ITC Doc. 80, List 1, Statement of Professor Dooley at 3 (quoting from Form S-1 and Regulation S-K and from Southwire Prospectus); *see* 17 C.F.R. § 229.101(c)(x) (1987).

69. *Id.; see Southwire Prospectus* at 3, 6.

70. *Id.; see Southwire Prospectus* at 25.

71. *See* ITC Doc. 114, List 1, at 136–37; Statement of Dooley at 13 (quoting from Southwire Registration Statement at 7–8), ITC Doc. 80, List 1.

72. ITC Doc. 114, List 1, at 138.

petition and dismissing Sural's contentions regarding the SEC registration statement as unnecessary.[73] Southwire's attorneys indicate they were convinced that the Venezuelan imports posed a material threat to Southwire yet at the same time contended that disclosure was unnecessary. Southwire's position is inherently inconsistent, and does not constitute a rational explanation for its failure to mention Venezuelan imports or foreign competition, and their threat to the industry, in its registration statement.

Southwire would have it both ways: Sural is not a threat for the purposes of selling securities, but is a threat to an unconcerned industry for purposes of this litigation. Southwire cannot have it both ways. In addition to the lack of industry support, the Court finds in Southwire's 1987 SEC registration statement compelling evidence—provided in the record by petitioner's own document—that the U.S. industry is not threatened by reason of Venezuelan imports of EC rod. On remand, the ITC is ordered to explain how the ITC questionnaires to U.S. companies in the EC rod industry and Southwire's own registration statement can be reconciled with respect to the condition of the industry and the U.S. companies' views, as reflected in the ITC questionnaires, concerning the degree of threat posed by Venezuelan imports.

### Background to the Southwire— Sural dispute

■ Given the peculiar circumstances of this case, the Court finds the facts that underlie the Southwire—Sural relationship both significant and enlightening. Southwire actually founded Sural in 1975, as a joint venture with a Venezuelan firm.[74] It built Sur-

al's plant, selected its management, and controlled its operations and sales through March of 1985.[75] Southwire also introduced Sural products into the .U.S. market. Through 1985, Southwire purchased large amounts of Sural's EC rod for its own U.S. operations. In 1984, for example, [ ] of Sural's U.S. sales went to Southwire.[76]

When Southwire was questioned by the Commission whether voluntarily or by agreement it had advised Sural on certain sales and offers in the United States, Southwire responded that those services are expected in such agency arrangements.[77] The Southwire representative sidestepped the gist of the Commissioner's question by stating that "there was really only one way of getting into this market . . . so whether we advised them to cut the price to get in, I don't think is relevant." [78]

This Court disagrees with Southwire's disingenuous assessment of the relevancy of whether it counseled Sural to sell to the United States market at LTFV. To the contrary, the Court finds it highly relevant, and highly irregular, that the sole company to bring the instant petition claiming sales at LTFV in 1987, appears to have been counseling Sural to do just that through 1985. Ironically, the record indicates that Southwire itself set Sural's prices in two of the four years that Southwire complains of for unfair pricing (1984 and 1985).[79] Remarkably, the Commission was asked by Southwire to punish Sural for acts that Southwire itself voluntarily committed and from which Southwire itself benefitted.

In addition to these business relationships, Southwire's affiliate, Southwire Metals Inter-

73. ITC Doc. 14, List 2 (Exhibit "c").

74. *See Staff Report,* List 2, at A–18, A–35.

75. *Id.* at A–36. *See also Respondent's Post Hearing Brief* at 7. Southwire responds that as a world leader in continuous casting and rolling technology, it is not atypical that it sells equipment to its competitors. ITC Doc. 114, List 1, at 42–43. In light of Southwire's past relationships with Sural, the latter could hardly be labeled a competitor for the purposes of that remark.

76. *See Pre-conference Brief of Sural,* ITC Rec., List 2, at 10 & Confidential Exhibit P.

77. ITC Doc. 114, List 1, at 23–24.

78. *Id.* at 24.

79. ITC Doc. 114, List 1, at 125; *see also Post Hearing Brief of GE* at 2–4. Although Southwire and Sural terminated their relationship in March 1985, most contracts in the field are long term and were thus negotiated near the end of 1984 and early 1985 for the entire year of 1985. Thus Southwire played a central role in setting Sural's prices throughout 1985.

national, was also the exclusive sales agent for Sural's sales of EC rod in the U.S. through March 1985, and it effectively set Sural's prices in the U.S. market, as a result of its 49 percent equity interest in Sural, its management of Sural, and the effective control over Sural's prices exercised by the Southwire General Manager assigned to the Sural project.[80] In 1985, following a disagreement over the repayment of loans and the effect of exchange rates *inter alia* Southwire sold its interest in Sural.[81]

Imports from Venezuela made a modest entry into the United States in 1984 and 1985, in part because it served Southwire's interests and in part because the Venezuelans perceived market opportunities in the United States. The Venezuelan imports were also welcomed by other members of the EC rod industry and the aluminum industry—two industries that are difficult to separate given the predominance of vertical integration.

It has been established in the record that there is a severe shortage of EC rod in the U.S. market at present and that the U.S. producers cannot and will not be able to satisfy demand in the near future. Purchasers of EC rod have found that the Venezuelan imports are the most logical and economical alternative to make up for the shortfall.

Moreover, purchasers have demonstrated the unreliability of U.S. producers and their inability to provide sufficient quantities of the EC rod crucial for the functioning of the U.S. wire and cable mills. As the rest of the U.S. industry reduces EC rod production, Southwire is poised to reap substantial benefits if it can exclude foreign competitors from satisfying severe shortages of EC rod in the United States. The evidence in the record strongly suggests that Southwire has used the petition process to favor its needs and goals over those of the rest of domestic industry.

**Additional Factors Concerning Threat of Injury**

The Court now turns its attention to other factors considered by the ITC, including the following: expansion of Venezuelan EC rod capacity, U.S. inventories of Venezuelan rod, import trends, and the relevancy of European Community trade policy and the potential for diversion of Venezuelan exports to the United States from the European Community.

[16] The ITC, in its Final Report, found that the domestic industry was "improving but still vulnerable" to the threat of unfairly traded EC rod from Venezuela.[82] From the face of the Final Report, it is difficult to discern with precision what weight the ITC gave to each potential factor that led to the threat of injury determination. Given the vagueness of the ITC Final Report, this Court can only examine the salient issues and determine whether they were based on substantial evidence.

The Court need not, however, find that the ITC's conclusions were not based on substantial evidence on every issue—especially because the ITC was not specific in its Final Report. For example, this Court may find that the ITC conclusion on a particular issue is based on substantial evidence. It does not follow, however, that that consideration alone, or in conjunction with others is substantial evidence of threat. The silence or opposition of every member of the industry except the petitioner, the petitioner's own publicly disclosed statements, and the evidence cited by the ITC in its Final Report do not add up to substantial evidence of threat of injury.[83]

The ITC's decision is based in part on performance levels in 1984 (when the petitioner controlled Sural) and on an inference that the improved performance of the industry may have been caused by the institution

---

80. *See Staff Report*, List 2, at A–36; Butler Aff., para. 8, *Sural's Responses to Questions from the Commission*, ITC Doc. 16, List 2, at 15; *Post Conference Brief of GE*, ITC Doc. 15, List 2, at 1, 3.

81. *See Staff Report*, List 2, at A–18, A–36; ITC Doc. 114, List 1, at 41.

82. *Final Report*, List 1, at 11.

83. This Court does not preclude, *a priori*, a finding of injury or threat of injury in any case where there is feeble industry support for a petition.

of the underlying investigations and consequent reduction in imports from Venezuela.[84] Additionally, the Commission dedicates the penultimate paragraph of the majority opinion to the supposition that changes in the European Community import laws would result in a diversion of Venezuelan imports to the United States, thus contributing to the threat.

This Court has already discussed why the ITC's choice of 1984 as the bellwether of health in the domestic industry for the entire period of investigation distorts and ignores larger trends in the decade that are well documented in the record. This Court need not decide whether the ITC's consideration of the pending investigation in influencing the improvement of the domestic industry was proper in this case because at least several key factors in the record indicate that no correlation can reasonably be drawn between the investigation and the improvement of the industry.

If the subsidized imports at less than fair value had a negative effect on the price adder, for example, one would expect the adder to go down upon entry of the imports and to recover upon initiation of the investigation. In fact, the fabrication adder, which is the charge to the buyer of converting primary aluminum to aluminum rod, trended up since mid 1984, when Venezuelan imports increased.[85] Thus, domestic companies were able to maintain and even increase charges over raw material during the period of investigation. This observation is in harmony with the fact that the industry began contracting and then experienced severe shortages of EC rod. In any event, the record shows nothing but improvement since June of 1987: The initiation of the investigation in 1987 appears to have had no effect whatsoever on this trend.

Similarly, The Court has examined the record with respect to the potential effect of the petition on domestic sales. Since late 1987, virtually every U.S. smelter has been operating at capacity.[86] The issue of whether the U.S. producers regained sales volume as a result of the investigation drops out when the U.S. producers are operating at maximum capacity. They could not have sold more rod if they wanted to.

The Commission has not even suggested that there is any evidence in the record that the initiation of this investigation caused Venezuelan imports to decrease so that the U.S. industry would be able or obligated to operate at maximum capacity. Indeed, the slight decrease in Venezuelan imports was inconsequential in view of the total tonnage produced annually in the U.S. market. In sum, this Court holds that the conclusion of the ITC that the investigation itself contributed significantly to the improvement in the domestic industry is not supported by substantial evidence on the record.

■ The Court next turns to the ITC's reliance on the assertion in Southwire's *Post Conference Brief* regarding the diversion of Venezuelan imports from the European Community to the United States because of import ceilings and tariffs in the Community. The specific contention was that "[r]eportedly, Venezuela has already exceeded the non-dutiable quota for 1988." *Final Report* at 16 n. 44; *Southwire Post Hearing Brief* at 9–10. Nowhere in the record was this information developed in such a way to justify its inclusion in Southwire's *Post Hearing Brief.* The Commission made the double error of accepting this information and then rejecting Sural's rebuttal information regarding the European Community tariff and quota schemes. *See Suramerica de Aleaciones Laminadas, C.A. v. United States,* 14 CIT 366 (1990).

It is highly questionable whether the European Community information should have been allowed at all considering that the Commission questionnaire [87] did not even mention the European Community but instead referred only to the United Kingdom. In their

---

84. Once again, the Commission has not provided any citation for this proposition. *See Final Report*, List 1, at 11.

85. ITC Doc. 114, List 1, at 147.

86. *Id.*

87. Question 10 of the ITC questionnaire issued May 2, 1988.

June 16, 1988 response, the Venezuelan producers stated that [ ].

Southwire's *Pre-Hearing Brief*, dated June 20, 1988, contained no mention of any EEC import duty.[88] Indeed, Southwire devoted the equivalent of only two pages of its 25 page brief to the entire issue of threat of material injury. In essence, the Commission fashioned much of the threat case in the matter at bar.[89] Even the Commission, however, only dedicated a few conclusory sentences of its Final Report to the EEC duties. *See Final Report* at 16. For support, the Commission cited the second-hand assertion slipped into the Southwire *Post Hearing Brief* in apparent violation of the ITC's own regulations. *See Plaintiffs' Memorandum in Opposition to the Motion for Rehearing* at 10; 19 C.F.R. § 207.23(b) (1988).[90] The only other "evidence" in the record was two sentences in the 211-page hearing transcript, also in apparent violation of the ITC regulations. ITC Doc. 114, List 1, at 21 (Southwire sales manager asserting that EEC import controls would lead to a diversion of Venezuelan EC rod to the United States). *See id.*

Whether or not Southwire's two sentence contention regarding the potential effects of EEC import laws on the diversion of Venezuelan rod to the United States in the *ITC Hearing Transcript* put Sural on notice to respond is irrelevant, however, because as Commissioner Brunsdale points out in her dissenting opinion in the Final Report, "Petitioner has not ... supported its argument with the facts necessary to substantiate its contention, *e.g.*, the amount of EC rod shipped from Venezuela to the Communities, the likely effect of the duty on European

consumption of Venezuelan EC rod, et cetera." *Final Report*, List 1, at 56.

Southwire's assertion that the Venezuelan nondutiable quota had actually been exceeded was a new contention. None of events cited by defendants contained an assertion that the ceiling actually had been reached. *See Defendants' Motion for Rehearing* at 6–7. This Court holds this assertion inoperative to the extent Sural was not permitted rebuttal.[91] Likewise, to the extent the ITC relied on other references in the record to Venezuelan imports to Europe, Sural should have been allowed to present its rebuttal. *See Suramerica*, 14 CIT 366, 368–74 (1990). In the rebuttal letter of July 19, 1988, that plaintiffs attempted to submit, Sural presented important evidence to the Commission as to why surpassing the nondutiable quota would not result in a decrease in imports to the EEC. The Court considers Sural's July 19, 1988 letter part of the administrative record that must be considered.

In conclusion, the Court finds that the ITC improperly considered the EEC tariff information based on the following independently sufficient grounds: 1) Southwire did not support its claims with the facts necessary to substantiate its contention; 2) Sural's letter that should have been considered by the ITC rebutted all of Southwire's claims such that no reasonable mind could find that the threat of a diversion of imports from the EEC to the United States was real or imminent.

The Court next turns to the issue of the Venezuelan EC rod producers' capacity. First, the Commission noted that capacity to

---

88. ITC Doc. No. 72, List 1.

89. In fact, given the paucity of information and argument provided by Southwire concerning threat of injury, one Commissioner actually had to ask Southwire's counsel at the hearing whether Southwire was pursuing that aspect of its claim. ITC Doc. 114, List 1, at 63.

90. For the purposes of fairness and to promote an informed debate on the issues, the C.F.R. instructs that what is not in the pre-hearing briefs may not be used at the ITC hearing; likewise, what is not used in the hearing may not be brought up in the post hearing briefs. Since neither Southwire nor the ITC specifically ques-

tioned whether the Venezuelans exceeded their EC tariff or whether that would have the effect of diverting EC rod to the U.S., arguably Southwire was precluded from bringing that specific issue up again, at the hearing or in the post hearing stage. Southwire contends that it found out about that information very late. Even if this was true, Sural should have been permitted to rebut.

91. Even when this sentence is added to the sentence from the hearing transcript, Southwire has not presented the requisite facts for the Commission to come to any conclusion regarding the effect of EEC import laws based on substantial evidence.

produce aluminum rod domestically increased in 1984 and 1985 to a high point of 528,175 tons then declined to 466,920 in 1987 for a ten percent decline overall. *Final Report,* List 1, at 7. This is in keeping with the domestic producers' strategy to shift scarce raw aluminum to higher value-added products.

The Commission further found that the record showed that the Venezuelan rod capacity would be increasing. *Final Report,* List 1, at 13. The record clearly demonstrates that the domestic producers are selling off significant EC rod capacity. The record reflects that the Venezuelans are expanding capacity. The issue is whether the Venezuelans are going to replace domestic market share to the point of posing an imminent threat of injury. Six out of seven domestic producers did not bother to place a check on a Commission questionnaire to indicate a need for the protection of the United States trade laws from this supposed threat. Moreover, the question of increased Venezuelan mill capacity must be viewed concurrently with the issue of the world supply of aluminum; if there is a scarcity of world aluminum, the Venezuelans' increased capacity cannot threaten the domestic industry with injury. Since the Commission was able to point to no evidence in the record that the Venezuelans had economically feasible access to world supplies of aluminum and six of the seven members of the domestic industry chose not to support the Southwire petition, the Commission's concern over rod capacity is not supported by substantial evidence.

In addition, the Commission has supported the finding of increased capacity by claiming that some of the Venezuelan mechanical rod mills were equipped to produce EC rod as well. *Final Report,* list 1, at 13. This claim is not supported by substantial evidence. Given the scarcity of aluminum, both domestic and Venezuelan producers have been allocating more and more of their raw aluminum

to higher adder products, one of which is mechanical rod.

The Venezuelans [ ].[92] [ ].[93] The Venezuelans claim that [ ]. *Plaintiffs' Memorandum in Support of Motion for Judgment on the Administrative Record* at 47. Finally, even if it were reasonable to treat a fraction of the production at this mill as idle EC rod capacity, the Commission has made no showing that the Venezuelans have been willing or able to use their significant idle capacity for EC rod that has prevailed throughout the decade. It is not logical or appropriate to count the full capacity at the new mechanical rod mill in the EC rod mill total. At most, the Commission may reasonably consider that the proportion of the new mill's total capacity that is capable and likely to produce EC rod is the same as [ ] That proportion was [ ]. *See Staff Report,* List 2, at A–18.

The Commission also focused on the Venezuelan aluminum industry and government program to expand smelting capacity in order to provide more aluminum for EC rod capacity. The Commission found that smelting capacity would increase 176,000 metric tons by 1989 [94] and 80,000 metric tons by mid–1991, with further expansion planned through the year 2000.[95]

Venalum planned the 176,000 metric ton expansion. There is no basis in the record, however, to conclude that this increase would be available to Venezuelan EC rod producers. As the Staff concluded: "Venalum has metal commitments of [ ] of its projected capacity [ ] to be attained in mid–1989." *Staff Report,* List 2, at A–19. These commitments were directed at various export customers and negotiations in progress at the time of the Staff Report, and were likely to supersede sales to local companies. *See Staff Report,* List 2, at A–19–A–20.

The other expansion projects discussed in the Staff Report [96] were scheduled for completion many years in the future and thus do not meet the test established by *Alberta Gas*

---

**92.** *See Staff Telephone Notes,* ITC Doc. 28B, List 2; *see also Staff Report,* List 2, at A–19.

**93.** *Staff Report,* List 2, at A–19.

**94.** *Final Report,* List 1, at 14.

**95.** *Id.* at n. 36.

**96.** *See* Chart at A–17, *Staff Report,* List 2.

*Chemicals, Inc. v. United States,* 1 CIT 312, 515 F.Supp. 780 (1981), which held that unfinanced plans for expansions in capacity, scheduled for completion several years in the future, may not provide the basis for a threat determination under the statute.

■ The Court in *Alberta Gas* explained that the plans "were uncertain and depended upon several contingencies, and indeed, financing had not even been arranged.... [E]ven if [the producer] had immediately decided to expand its production facilities, production in such facilities could not commence until 1982 [two, and a half years after the ITC's final determination] at the earliest, assuming there were no unforeseen delays." *Alberta Gas,* 1 CIT 312, 323–24, 515 F.Supp. 780, 791. That the Commission has shown that a mere *possibility* of injury might occur at some remote future time is not substantial evidence on the record of a "likelihood of injury." *See id.,* 1 CIT 312, 324, 515 F.Supp. 780, 791.

■ The link between expanded capacity and increased imports is even more tenuous in the case at bar. In *Alberta Gas,* the manufacturer hoped to expand its capacity to manufacture the product under investigation. In this case, the ITC majority speculated first that Venezuela's capacity to produce the *raw material* will increase and, then that the increased raw metal production will be channelled into EC rod production, and further yet that this EC rod would be exported to the United States. The Venezuelans' express intention to play a more important role in the U.S. market is not substantial evidence that the Venezuelan rod threatens material injury to the U.S. industry in light of the uncertainty of the new projects (*e.g.,* lack of financing or contracts for the land) and the prior commitments outside the U.S.

As the Staff indicated, "According to Venezuelan aluminum industry officials, the Alusur project [next in time after the Venalum project] is only at the letter of intent stage, with neither land, financing, nor construction yet arranged for the project. With a 3–½ year turn around from engineering to start-up, smelter completion would not likely meet its projected start-up date of 1990." *Staff Report,* List 2, at A–20. In fact, given these contingencies, whether that project would go on line at all as planned was speculative.

Likewise, the "Aluyana" and "Alamsa" aluminum projects had not received financing yet.[97] All of the projects listed in the Staff Report with a scheduled completion time of 1991 and beyond were improperly considered by the ITC.[98] They clearly fail the *Alberta Gas* test for a lack of "imminence." 19 U.S.C. § 1677(7)(F)(ii).

Defendants have argued that because the Venezuelans have already begun to expand their smelting capacity, the *Alberta Gas* test does not apply and the Commission's finding of threat was proper. *Defendants' Memorandum in Opposition to Plaintiffs' Motion for Judgment on the Administrative Record of the ITC and Motion to Strike (Confidential)* at 29, n. 58; *Citrosuco Paulista, S.A. v. United States,* 12 CIT 1196, 1219, 704 F.Supp. 1075, 1095 (1988). Again, Defendants are clutching at straws—or rather oranges in this case.

The *Citrosuco Paulista* Court stressed that "[e]ach threat determination is based upon the facts of the particular case...." 704 F.Supp. at 1094. Defendants would have the Court accept an analogy between the cultivation of orange trees in *Citrosuco,* and the construction of complex industrial projects in *Suramerica.* This Court rejects this analogy for the purposes of this particular case. Moreover, the *Citrosuco* Court was impressed that the Brazilian orange growers had *already* boosted capacity by improved technology—this has not been alleged by the defendants in the case at bar. What capacity the Venezuelans *have* planned imminently, the 176,000 mt Venalum project, has already been allocated to customers outside of the United States.

---

**97.** *Plaintiffs' Memorandum in Support of Motion for Judgment on the Administrative Record* at 53 & n. 126. Plaintiff cites to sources that confirm this Court's concern over the Commission's spec-

ulations regarding Venezuelan smelting in the 1990s and beyond. *See id.* at 53–54 n. 127.

**98.** *See* Chart, *Staff Report,* List 2, at A–17.

In sum, the Court finds that the Commission has not based its decision that the Venezuelans would gain significant new sources of raw aluminum, either from the world market or from planned expansion of smelting capacity in the near future, on substantial evidence on the whole record; nor has the Commission established that those phantom supplies of aluminum were likely to be allocated to EC rod that was likely to be imported to the United States. The lack of substantial evidence, together with the information offered in rebuttal on this issue alone, seriously undermines the majority finding of threat. As noted earlier, this Court instructs the ITC on remand to bring forth any information in the record that it may find on the availability and relevance of world supplies of aluminum.

 Finally, the Court considers the issues of market penetration and domestic inventories of Venezuelan rod. The Commission made much of an alarming increase in market penetration by the Venezuelans to the detriment of domestic producers. The Final Report notes that market penetration rose from seven percent in 1984 to fifteen percent in 1985 and 1986. *Final Report,* List 1, at 14.

It is curious that the Commission could find no material injury at this level of penetration—even if the Commission could assume that it remained constant at fifteen percent for 1985–88. Yet now, after several years at a stable level of market penetration, the ITC has construed the Venezuelan imports as a threat. More insidiously, the Commission's "rapid increase" in market penetration took place while Southwire was in effective control of Sural, by far the largest Venezuelan exporter.

Southwire, in its Post Hearing Brief, surmised that levels would reach between eighteen and twenty-five percent by the end of 1988. *Petitioner's Post Hearing Brief,* at 8. The Commission noted that import penetration rose from twelve to fourteen percent in the first quarter of 1988. The Court rejects the Commission's first quarter findings for 1988 as the Commission itself has

asserted that the interim data is unreliable "in determining trends." Unfortunately, the Commission majority has once again adopted the speculation and conjecture of the petitioner, who has foisted this case upon the ITC and this Court.

The market penetration data are not evidence of threat, nor is the majority's analysis consistent with the Commission's other findings. This level of market penetration is consistent, however, with ample testimony in the record regarding the shortage of domestically produced EC rod and the need for purchasers such as GE to obtain the rod outside the United States borders.[99]

The Commission also expressed concern with respect to increased imports regarding Sural's acquisition of wire and cable plants in the United States. Sural plans to supply these plants mostly with Venezuelan rod. *Final Report,* List 1, at 15. As the Court discussed *infra,* many of these plants were already being supplied either by the Venezuelans or the American companies that abandoned and sold the plants to the Venezuelans, and that did *not* support the petition.[100]

The Commission contends that Venezuelan inventories increased substantially in the United States during 1987 and first quarter 1988 from negligible levels in 1984–1986. *See Staff Report,* List 1, at A–51; *Staff Report,* List 2, at A–77. In fact, the Commission was relying on end-of-period inventories reported by importers. U.S. producers generally do not inventory the imported rod because it is earmarked immediately for wire and cable production. The Court notes that [ ] values reported for 1984, 1985, and 1986 support this Court's earlier analysis regarding the shortage of EC rod in the domestic market and the need for imports. Although the jump in end-of-period inventory was substantial in 1987 in relation to 1986 levels, it was not substantial in light of the size of the U.S. market. *See id.* at A–77 ([ ] in a market of 400,000). Moreover, the Court notes that Venezuelan imports began trend-

---

99. *See e.g., Statement of Mr. Robertson,* Corporate Contracting Agent, Aluminum, General Electric, ITC Doc. 114, List 1.

100. *See* note 46, *infra, Plaintiffs' Brief* at 57.

ing downward significantly in 1986—long before the investigation was initiated. *See Staff Report,* List 2, at A–79 (table 19: 1984–87).

## CONCLUSION

The Commission majority based its determination of threat of material injury on a number of factual findings. Those findings were not based on substantial evidence in view of the whole record. The lack of support of six out of seven domestic producers for the petition, as well as the opposition of Alcoa and the major union in the industry and Southwire's own optimistic (or disingenuous) SEC registration filing loom heavily over what one Commissioner has conceded was a close call on threat. In short, the factual findings upon which the majority based its determination—even if some of those findings were correct and supported by substantial evidence—were insufficient as a matter of law to support a determination of threat of material injury under the statute. To the extent that any threat might exist in the future, the ITC Report did not establish, based on substantial evidence, that the threat was "real" or "imminent."

The Court is well aware of the executive branch's dislike for judicial review in trade cases. Indeed, from one point of view, trade matters are political matters, and therefore should not be subject to judicial review. Nonetheless, this Court will not abdicate its congressionally and constitutionally mandated duties of judicial review in order to entertain the pursuit by Southwire of a personal business vendetta veiled in speculation, conjecture, and distortion regarding Venezuelan imports of EC rod. In the view of the Court, this case was *not* a "close call."

Meanwhile, the Venezuelan companies have been laboring under severe duties for five years. A speedy resolution of this matter is the only way to preserve an all but hollow victory for the Venezuelan plaintiffs in this five year ordeal.

## ORDER

This matter is remanded to the International Trade Commission ("ITC"). The ITC's threat of injury finding was not based on substantial evidence or otherwise in accordance with law.

Upon remand, the ITC must explain what evidence it drew upon in the record to conclude that there was an ample supply of aluminum available on the world market. The ITC must further explain how it concluded there was substantial evidence on the record that the supply of aluminum was an economically viable option for the Venezuelan producers. Finally, the ITC must explain what evidence in the record led it to find that the world supply of raw aluminum caused a likelihood of threat to the U.S. EC rod industry, based on substantial evidence. In this regard, plaintiff shall be permitted to present a rebuttal of the ITC's finding regarding the availability of world supplies of aluminum located in the Final Report of the ITC. *ITC Doc. 115, List 1, at 14.* The rebuttal shall be no more than ten pages, double spaced, single side of the page, and shall be filed concurrently with chambers and at the ITC by no later than thirty days beginning with the date of this Order.

Moreover, the ITC must explain how its findings were based on substantial evidence in light of the lack of industry support for the petition, evidenced in part by the ITC questionnaires, and the sole petitioner's optimistic portrayal of the state of the industry in its SEC registration form. It is hereby

**ORDERED** that the Commission report its remand results within sixty days of the date of this order, or in the alternative, rescind the original threat of injury finding. It is further

**ORDERED** that the parties will have thirty days to comment on the ITC's redetermination. It is further

**ORDERED** that the parties will have fifteen days for rebuttal based upon their respective comments on the ITC redetermination. It is hereby

**ORDERED** that the affirmative determination of the International Trade Commission is reversed and remanded.

**SO ORDERED.**