**SURAMERICA de ALEACIONES LAMINADAS, C.A., Conductores de Aluminio Del Caroni, C.A., Industria de Conductores Electricos, C.A., and Corporation Venezolana de Guayana, Plaintiffs–Appellees,**

v.

**The UNITED STATES, and the United States Department of Commerce, Defendants–Appellees,**

**The United States International Trade Commission, Defendant–Appellant,**

**and**

**Southwire Company, Defendant–Appellant.**

Nos. 93–1579, 94–1021.

United States Court of Appeals, Federal Circuit.

Dec. 30, 1994.

Rehearing Denied; Suggestion for Rehearing In Banc Declined Feb. 10, 1995.

Wendy E. Ackerman, Shearman & Sterling, Washington, DC, argued for plaintiffs-appellees. With her on the brief were Thomas B. Wilner and Thomas A. DiBiase; Of counsel was Jeffrey M. Winton. Claire E. Reade, Arnold & Porter, of counsel.

Stephen McLaughlin, Atty., Office of the Gen. Counsel, U.S. Intern. Trade Com'n, argued for defendants-appellants. With him on the brief were Carol McCue Verratti, Atty., Lyn M. Schlitt, Gen. Counsel and James A. Toupin, Asst. Gen. Counsel. Michael S. Kane, Atty., Dept. of Justice, Washington, DC, Velta A. Melnbrencis and David M. Cohen, Attys. represented the defendants-appellants, the U.S.

Lawrence J. Bogard, McKenna & Cuneo, Washington, DC, argued for defendant-appellant, Southwire Company. With him on the brief was Catherine E. Edmondson.

Before MICHEL, PLAGER, and RADER, Circuit Judges.

RADER, Circuit Judge.

The International Trade Commission (ITC) found that Venezuelan imports of aluminum electrical conductor rod (EC rod) pose a threat of material injury to a domestic industry. The Court of International Trade reversed for lack of substantial evidence supporting the threat finding and remanded. *Suramerica de Aleaciones Laminadas, C.A. v. United States,* 818 F.Supp. 348 (Ct.Int'l Trade 1993) (*Suramerica*). ITC then rescinded its threat finding. The Court of International Trade affirmed. *Suramerica de Aleaciones Laminadas, C.A. v. United States,* 841 F.Supp. 1220 (Ct.Int'l Trade 1993). Because the record supports these Court of International Trade determinations, this court affirms.

## BACKGROUND

EC rod is an intermediate product between primary aluminum and finished aluminum wire and cable. The domestic EC rod industry includes seven producers: Southwire Company; Alcan Aluminum Corporation; Aluminum Company of America (Alcoa); Essex Wire and Cable; Kaiser Aluminum and Chemical Corporation; Noranda Aluminum, Inc.; and Reynolds Metal Company. Several are vertically integrated producers who smelt primary aluminum, convert it into EC rod, and then process EC rod into aluminum wire and cable. Vertically integrated producers make most of the domestic EC rod supply.

Because the major portion of the electric power grid in the United States is complete, the EC rod market primarily supplies rod for repair and replacement of existing power lines across the nation. *Suramerica,* 818 F.Supp. at 355. Thus, with the completion of the power grid, the market for EC rod is no longer constantly expanding, but has reached a plateau. Due to the shift to a stable market, domestic manufacturers have scaled back their production of EC rod. *Id.*

A cyclical high in domestic EC rod production occurred in 1984. *See Suramerica,* 818 F.Supp. at 356. Demand, however, did not continue to rise. With inventories rising and a shift downward in price, the result was a "crash" in the EC rod market shortly after the 1984 high. *Id.* In response, the domestic industry accelerated downsizing to eliminate excess inventories and reduce supply to match the reduced demand. *Id.* at 355–56. This action helped return the domestic industry to health. The domestic EC rod industry has remained consistently profitable. *Id.* at 357.

Appellees Suramerica de Aleaciones Laminadas, C.A. (Sural); Conductores de Aluminio del Caroni, C.A.; and Industria de Conductores Electricos, C.A. (together, the Venezuelan producers or industry) are Venezuelan manufacturers and exporters of EC rod. As domestic production dropped, imports of Venezuelan EC rod increased from 7% of the U.S. market in 1984 to 15% in 1985. Venezuelan imports have accounted for 12–15% of the market since 1985. Sural, which accounts for 90% of all Venezuelan imports, began keeping inventories of imported rod in the United States in 1987. Sural stored 4,000 tons of EC rod in the United States in 1987, and almost 7,500 tons in the first quarter of 1988. By comparison, domestic purchasers bought 346,000 tons of EC rod in 1987.

The Venezuelan producers have spare EC rod production capacity. Limits on the supply of raw materials, however, constrain their ability to increase production. World market aluminum supplies are not an attractive source because EC rod profit margins are low relative to transportation costs. Venezuelan producers cannot afford to purchase primary aluminum abroad and ship it to Venezuela for processing. *See Suramerica,* 818 F.Supp. at 358–60.

Domestic manufacturer Southwire founded Sural in 1975 as a joint venture with a Venezuelan firm. Southwire helped Sural enter the U.S. market in 1984 and 1985. Southwire itself purchased much of Sural's U.S. imports in 1984–85. *Suramerica,* 818 F.Supp. at 368. Southwire advised Sural during this period on making sales in the United States. *Id.* The relationship soured, however, and Southwire sold its interest in Sural in 1985. *Id.* at 369.

In 1987 Southwire petitioned the International Trade Administration (ITA) and ITC to impose countervailing and antidumping duties on Venezuelan EC rod imports. *Id.* at 352. ITA determined that the Venezuelan industry enjoyed government subsidies, and sold EC rod in the United States at less than fair value (LTFV). *Certain Elec. Conductor Alum. Redraw Rod from Venez.,* 53 Fed.Reg. 24,763 (Dep't Comm.1988) (final affirmative countervailing duty determination) (*Subsidy Report* ); *Certain Elec. Conductor Alum. Redraw Rod from Venez.,* 53 Fed.Reg. 24,755 (Dep't Comm.1988) (final determination of sales at LTFV).

ITC then investigated whether Venezuelan imports materially injured or posed a threat of material injury to a domestic industry. As part of its investigation, ITC sent a questionnaire to domestic EC rod industry members and other interested parties. The questionnaire asked each producer to check one of three boxes: supports the petitions; opposes the petitions; or does not want to take a position on the petitions.

None of the industry members checked the support box. One industry member, Alcoa, expressed opposition. *Suramerica,* 818 F.Supp. at 361. The others refused to take a position. *Id.* at 363. None have experienced or expect negative effects on their EC rod business from Venezuelan imports. *See id.* at 366. Other interested parties expressed opposition to the petitions, including General Electric Company, the Aluminum Trade Council, and the Aluminum Brick and Glass Workers Union. *Id.* at 361.

Some industry members expressed additional views on the petitions in private statements ITC withheld from the Venezuelan producers. In some instances, these additional views clarified a producer's reasons for withholding support from the petitions.

The ITC staff did not compare the prices of EC rod produced by vertically integrated producers with Venezuelan imports. Based on the limited volume of remaining domestic sales, the ITC staff found that Venezuelan rod was cheaper than domestic rod in five of nine quarterly price comparisons, and more expensive in the other four. *Suramerica,* 818 F.Supp. at 357–58.

Nonetheless ITC found that the domestic industry is vulnerable to EC rod imports. *Certain Elec. Conductor Alum. Redraw Rod from Venez.,* Nos. 701–TA–287, 731–TA–378, 1988 ITC LEXIS 64, at *13 (Available on WESTLAW FINT–ITC data base) (Int'l Trade Comm'n Aug. 1988) (final determination) *(Threat Determination ).* ITC also found that Venezuelan imports pose a threat of material injury under the factors specifically enumerated in 19 U.S.C. § 1677(7)(F)(i) (1988). *Threat Determination* at *13–21.

The Court of International Trade reversed. *Suramericana de Aleaciones Laminadas, C.A. v. United States,* 746 F.Supp. 139, 141 (Ct.Int'l Trade 1990). The court reasoned that, without industry support, Southwire did not have standing to bring the petitions "on behalf of" the domestic industry. *Id.* On appeal, this court held that ITA had discretion to initiate an investigation in response to a petition from an interested party who alleged that it was filed on behalf of an industry, without necessarily determining first that it was affirmatively supported by a majority or some other specified number of the domestic industry. *Suramerica de Aleaciones Laminadas, C.A. v. United States,* 966 F.2d 660, 667, —— Fed.Cir. (T) ——, —— (Fed.Cir.1992) *(Suramerica–CAFC ).*

On remand, the Court of International Trade held on the merits that substantial evidence did not support ITC's threat determination. *Suramerica,* 818 F.Supp. at 375. The court reasoned that the domestic industry was healthy, and that comparison to 1984 was inappropriate because that year represented a cyclical high for the industry. *Id.* at 356–57, 370. The court also evaluated the factors enumerated in section 1677(7)(F)(i) for threat determinations, together with other factors such as the lack of domestic industry support and Southwire's past relationship with Sural. *Id.* at 357–75. The court remanded for ITC to rescind its determination or explain how substantial evidence supports it. *Id.* at 375.

Southwire and ITC appealed to this court, which dismissed the appeals as unripe. *Suramerica de Aleaciones Laminadas, C.A. v. United States,* Nos. 93–1337, 93–1350, 1993 US APP LEXIS 14,879 (Fed.Cir. May 26, 1993). ITC then rescinded its threat finding under protest. *Certain Elec. Conductor Alum. Redraw Rod from Venez.,* No. 701–TA–287 (Int'l Trade Comm'n June 2, 1993) (determination on remand). The Court of International Trade affirmed. *Suramerica de Aleaciones Laminadas, C.A. v. United States,* 841 F.Supp. 1220 (Ct.Int'l Trade 1993). Southwire and ITC appeal.

## DISCUSSION

■ The Court of International Trade examines an ITC determination of a threat of material injury to discern whether it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). This court has determined to review the Court of International Trade by reapplying the substantial evidence standard to the underlying ITC determination. *Trent Tube Div. v. Avesta Sandvik Tube AB,* 975 F.2d 807, 813 (Fed.Cir.1992).[1] This court reviews

---

1. This rule originated with *Atlantic Sugar, Ltd. v. United States,* 744 F.2d 1556 (Fed.Cir.1984), which states without support:

We review [the Court of International Trade's] review of an ITC determination by applying anew [section 1516a(b)(1)–(B)'s] express judicial review standard.

*Id.* at 1559 n. 10.

*Atlantic Sugar* appears to rely on a belief that statute prescribes this court's standard of review. Read as a whole, however, section 1516a does not support this proposition. Section 1516a(b)(1)–(B) provides that "the court" must apply the statutory standard in actions brought

both ITC's threat determination and ITC's subsequent rescission of the threat determination for substantial evidence. *See id.*

Although reviewing anew the ITC determination, this court will not ignore the informed opinion of the Court of International Trade. That court reviewed the record in considerable detail. Its opinion deserves due respect.

## I.

ITC shares responsibility with ITA for countervailing duty and antidumping investigations. 19 U.S.C. §§ 1671(a), 1673(a) (1988). ITA determines whether the accused class of imports enjoys a subsidy, or is sold at LTFV in the United States. *Id.* ITC determines whether the imports materially injure or threaten to materially injure U.S. industry. *Id.*

■ Title 19 guides ITC in ascertaining a threat of material injury. 19 U.S.C. § 1677(7) (1988 & Supp. V 1993). At the outset, section 1677(7)(A) defines "material injury" as a "harm which is not inconsequential, immaterial, or unimportant." Thus, a threat of a material injury must pose a risk of significant harm to the domestic industry.

Underscoring this emphasis on the significance of the threatened injury, section 1677(7)(F)(ii) states:

Any determination by the Commission under this title that an industry in the United States is threatened with material injury shall be made on the basis of evidence that the threat of material injury is real and that actual injury is imminent. Such a

determination may not be made on the basis of mere conjecture or supposition. Therefore, a finding of a threat of material injury requires substantial evidence on the record as a whole that domestic industry faces a real threat of imminent material injury from the accused imports. Mere conjecture or supposition is not enough.

■ Section 1677(7) also identifies specific factors ITC must consider in assessing the threat of material injury. The statute unambiguously directs ITC to consider these factors and "other relevant economic factors" in assessing a threat of material injury. Section 1677(7)(F)(i); *see also* H.R.Rep. No. 725, 98th Cong., 2d Sess. 39 (1984) 1984 U.S.Code Cong. & Admin.News 4910, 5166 ("The Commission should examine all [r]elevant factors relating to possible threat of material injury...."). Because the ITC must consider all "relevant economic factors," it must examine, beyond the factors specified in section 1677(7), any other factors that tend "to make the existence of a [threat of material injury] more probable or less probable than it would be without the [factors]." Fed.R.Evid. 401 (defining relevancy); 19 C.F.R. § 210.42(b) (1994) (relevant evidence admissible in ITC investigations).

This court's decision in *Trent Tube* does not afford ITC discretion whether to consider relevant economic factors beyond those listed in section 1677(7) when examining a threat of material injury. In *Trent Tube,* the ITC had found actual material injury. 975 F.2d at 809–11. Section 1677(7)(B)(ii) states that ITC "may" consider relevant economic factors beyond those listed when examining

---

under 19 U.S.C. § 1516a(a)(2) (1988). Section 1516a(a)(2) addresses the Court of International Trade's review of certain ITC determinations. Thus "the court" of section 1516a(b)(1)–(B) is the Court of International Trade. Section 1516a is silent on what standard this court should apply when reviewing a Court of International Trade decision.

Were this a case of first impression, this court might follow the example of the Supreme Court when it was called on to review a review of an administrative action:

Whether on the record as a whole there is substantial evidence to support agency findings is a question which Congress has placed in the keeping of the [court reviewing the agency determination]. This Court will intervene only

in what ought to be the rare instance when the [substantial evidence] standard appears to have been misapprehended or grossly misapplied.

*Universal Camera Corp. v. NLRB,* 340 U.S. 474, 491, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951). Congress has placed the review of ITC determinations in the keeping of the Court of International Trade. That court has the statutory mission to review ITC determinations for substantial evidence. If in a future appeal this court were offered the opportunity to reconsider the *Atlantic Sugar* rule *en banc,* this court might better consider only whether the Court of International Trade misapprehended or grossly misapplied the statutory standard.

an actual injury. *See Trent Tube,* 975 F.2d at 814 (the ITC "may also consider other relevant factors"). As already explained, however, the standard for assessing a "threat of material injury" is different. Section 1677(7)(F)(i) directs that ITC "shall" consider all relevant economic factors in a threat investigation. Section 1677(7)(F)(i) leaves ITC with no discretion in this matter. Thus, the breadth of relevant factors in *Trent Tube,* a material injury case, does not govern in this threat of material injury case.

The wider scope of a threat investigation reflects the greater uncertainty and risk of error involved in prospective relief. *See* H.R.Rep. No. 1156, 98th Cong., 2d Sess. 174 (1984) 1984 U.S.Code Cong. & Admin.News 5291 ("the projection of future events is necessarily more difficult than the evaluation of current data"). ITC must not disregard any relevant economic factor that might help in making this difficult assessment. *See id.* (ITC must "conduct a thorough, practical, and realistic evaluation" of the market).

█ The Court of International Trade, following the statutory directive, ordered ITC to consider two factors not listed in the statute that tend to show a threat of material economic harm—domestic industry support for the petitions, and the views of other interested parties such as consumers of EC rod. *Suramerica,* 818 F.Supp. at 375. This order obeys the statutory requirement to consider other relevant economic evidence in a threat investigation.

The views of the potentially threatened domestic industry on the nature of the threat and the views of consumers of the imports are without doubt relevant to whether the domestic industry faces a threat of material injury. The industry best knows its own economic interests and, therefore, its views

can be considered an economic factor. Indeed an industry's failure to acknowledge an affirmative threat has direct significance. *See Oregon Steel Mills Inc. v. United States,* 862 F.2d 1541, 1543–46 (Fed.Cir.1988) (dismissing challenge to ITA revocation of antidumping duties opposed by the domestic industry). And in the difficult enterprise of projecting future economic harm, the industry's views take on added relevance. Moreover, publicly expressed industry support for the petition, or lack of it, is probative evidence of those views.

The Court of International Trade's adherence to the statutory standard for relevant economic factors is fully consistent with this court's holding in *Suramerica–CAFC.* In *Suramerica–CAFC,* this court determined that ITA has discretion to find that a petition filed by a single interested party suffices to confer standing "on behalf of" the industry. *Suramerica–CAFC,* 966 F.2d at 667. Thus, an investigation may get underway on the filing by a single interested party "on behalf of" the industry. Once the investigation is underway, however, the statute mandates consideration of relevant economic factors, including industry views, as shown, for example, by industry support for the petition.

█ In making a determination of threat of material injury, ITC must weigh industry views and views of other interested parties, together with all other relevant economic factors as appropriate under the record of each particular investigation. ITC may use its sound discretion in determining the weight to afford these and all other factors, but ITC cannot ignore them. Thus the Court of International Trade's remand instruction that the ITC consider these factors was required by the statute.[2]

2. The Court of International Trade erred, however, by stating that lack of industry support could only be overcome by "compelling evidence." *Suramerica de Aleaciones Laminadas, C.A. v. United States,* 818 F.Supp. 348, 364 (Ct.Int'l Trade 1993). ITC has discretion to weigh all types of relevant evidence in making a threat determination. Statute provides no basis for treating one type as more important than the others.

The Court of International Trade also erred by instructing ITC not to consider private state-

ments by industry members that the Venezuelan producers could not review. *Suramerica,* 818 F.Supp. at 365–66. During this investigation, 19 C.F.R. § 207.7(a) (1988) countenanced ITC consideration of confidential information not available to parties. The Venezuelan producers have not challenged the validity of former section 207.7(a). The private statements were admissible, and they are relevant to the level of industry support. ITC must consider them.

But that is not to say that ITC may rely on such statements to justify disregarding the unwilling-

## II.

■ This court now turns to a review of the record to determine whether substantial evidence supports ITC's threat determination. "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938), *quoted in Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed.Cir. 1984). Furthermore, the Court of International Trade and this court cannot evaluate the substantiality of evidence supporting an ITC determination "merely on the basis of evidence which in and of itself justified it, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). Instead, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Id.* at 488, 71 S.Ct. at 464; *accord Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed.Cir. 1984).

■ As noted earlier, section 1677(7) sets forth several economic factors to consider in assessing material injury or threats of material injury. This court will follow the statutory and other factors in reviewing the record evidence of threat.

### 1. Nature and Effects of the Subsidy (Section 1677(7)(E)(i), (F)(i)(I))

■ The ITA subsidy report discussed reasons for Venezuela's export bond program. The Venezuelan producers explained in the report that the bond program, which accounts for almost all of the gross subsidy on Venezuelan EC rod, only compensates for official overvaluation of the Bolivar. *Subsidy Report*, 53 Fed.Reg. at 24,769 (Comment 2).[3]

The Venezuelan producers also contended that the prevailing free market exchange rate correlated with the subsidy. *Id.* at 24,-769–70. Southwire did not controvert these contentions. *See id.*

ITC, apparently conceding that the export bond program compensated for Venezuelan exchange rate constraints, found that this program still provided "an even more important incentive to imports." *Threat Determination*, 1988 ITC LEXIS 64, at *16 n. 34. The export bond program, however, only facilitated the opportunity for Venezuelan producers to compete in export markets on a level playing field. Thus, the bond program did not provide Venezuelan producers with a subsidy advantage over U.S. manufacturers. ITC did not consider this, and thus did not comply with section 1677(7)(E)(i)'s requirement that ITC consider the likely effects of any subsidy.

The record as a whole does not show any significant potential harm to domestic industry, but suggests that the subsidy program only compensates the Venezuelan producers for a competitive disadvantage. Thus, the record does not suggest a real threat to the domestic EC rod industry.

### 2. Venezuelan Production Capacity Likely to Result in a Significant Increase in EC Rod Imports (Section 1677(F)(i)(II), (IV))

The Venezuelan producers have spare production capacity. ITC consequently found that Venezuelan capacity to produce EC rod may soon increase. *Threat Determination* at *16. On the other hand, as the Court of International Trade pointed out, the record shows that Venezuelan producers are not likely to obtain enough primary aluminum to increase EC rod production. *See Suramerica*, 818 F.Supp. at 358–60 (summarizing record). Due to transportation costs, Venezuelan EC rod producers cannot afford to pur-

---

ness of a domestic industry to publicly support a petition. That the industry is not willing to express public support is evidence that it does not perceive a real threat of immediate harm. Private statements of support, but for other interests, can diminish but not eliminate the probative value of this relevant evidence.

3. ITA rejected this argument not because it was inaccurate, but rather because the Venezuelan government administers the export bond program and its exchange rate controls separately. *Certain Elec. Conductor Alum. Redraw Rod from Venez.*, 53 Fed.Reg. 24,763, 24,770 (Dep't Comm. 1988).

chase primary aluminum on the world market. *Id.* at 358–59. Nor can they share in pending increases in the supply of Venezuelan primary aluminum, which are nearly all committed to other uses. *Id.* at 359.

As the Court of International Trade correctly observed, "[t]he issue is whether the Venezuelans are going to replace domestic market share to the point of posing an imminent threat of injury." *Suramerica*, 818 F.Supp. at 372. Upon a careful review of the record, the court found no basis for holding that the Venezuelan producers can readily obtain increased supplies of primary aluminum.[4] *Id.* at 360, 372. The record as a whole, as the court showed, does not suggest a real threat that the Venezuelan producers can acquire sufficient primary aluminum to significantly increase their imports to the United States.

3. Increase in Market Penetration to an Injurious Level (Section 1677(7)(B)(i)(I), (F)(i)(II))

United States market penetration by Venezuelan EC rod imports stabilized after 1985. During 1984–85, when United States market penetration increased, "[i]mports from Venezuela made a modest entry into the United States ... in part because it served Southwire's interests.... The Venezuelan imports were also welcomed by other members of the EC rod industry...." *Suramerica*, 818 F.Supp. at 369. Southwire itself purchased large amounts of Sural's 1984–85 imports. *Id.* at 368. Indeed Southwire advised Sural on making sales in the United States. *Id.* As the Court of International Trade correctly noted, Southwire's cooperation during the only period when market penetration by Venezuelan imports significantly increased undercuts Southwire's protestations about Venezuelan imports posing a real threat. *Id.* at 374.

4. Probability that Imports Will Enter the United States at Depressive or Suppressive Prices (Section 1677(7)(B)(i)(II), (F)(i)(IV))

In five of nine comparisons with the domestic price, the price of Venezuelan rod was lower; in the other four, the domestic rod price was lower. *Suramerica*, 818 F.Supp. at 357–58. Furthermore, the fabrication component of the domestic EC rod price— the portion of the EC rod price above the cost of primary aluminum—has increased since 1984. *Id.* at 370. Thus the price of the value added by domestic EC rod manufacturers has risen despite the presence of Venezuelan imports.

The majority of domestic consumers of EC rod preferred domestic rod over Venezuelan rod unless the foreign product was much less expensive. The ten comparison prices, however, did not show marked price differences. Thus, the record suggests that Venezuelan rod will have little depressive or suppressive effect on domestic prices, both because its prices are not significantly lower and because consumers prefer domestic rod. *See Threat Determination*, 1988 ITC LEXIS 64, at *58 (Dissenting Views of Acting Chmn. Brunsdale) (record facts, including erratic shipments of Venezuelan EC rod and Buy–American requirements in utility and governmental purchases, "tend to indicate a low elasticity of substitution" between Venezuelan and domestic EC rod).

ITC noted that Venezuelan imports enjoyed transportation freight advantages in the United States because most sales occurred within 100 miles of their ports of entry. *Id.* at *20. These same freight costs, however, prevent Venezuelan producers from competing effectively for sales in other areas of the country.

Again, the Court of International Trade observed that Southwire apparently counseled Sural to cut its prices in 1984 and 1985. *Suramerica*, 818 F.Supp. at 368. Southwire

---

4. ITC had relied on Sural's plans to buy U.S. rod and cable plants as suggesting that respondents "could" substantially increase their imports to the United States. *Certain Elec. Conductor Alum. Redraw Rod from Venez.*, Nos. 701–TA–287, 731–TA–378, 1988 ITC LEXIS 64, at *20 (Int'l Trade Comm'n Aug. 1988) (final determination). Sural

and Alcoa, however, previously supplied the plants in question with primary aluminum. Thus, planned ownership changes will not increase imports. *Suramerica*, 818 F.Supp. at 361. Moreover, Alcoa opposes the petitions, indicating that it perceives no threat of material injury. *Id.*

did not challenge this finding on appeal. Southwire itself, the largest U.S. producer of EC rod, did not perceive lower prices for Venezuelan EC rod to pose a threat of material injury. On the record as a whole, the pricing data do not show such a threat.

### 5. Substantial Increases in U.S. Inventories of Imported EC Rod (Section 1677(7)(F)(V))

United States inventories of Venezuelan EC rod increased from 4,000 tons in 1987 to almost 7,500 tons in the first quarter of 1988. The Court of International Trade correctly put this amount in the context of its potential effect on the U.S. market. *See Suramerica,* 818 F.Supp. at 374. With a 1987 U.S. market of 346,000 tons, the increase of Venezuelan inventories was not substantial. The record does not suggest that the increase in Venezuelan inventory levels, small compared to domestic consumption of EC rod, poses a real threat to the domestic industry.

### 6. Condition of the Domestic Industry (Section 1677(7)(B)(i)(III), (C)(iii))

The Court of International Trade noted: "The financial data relating to the [domestic] EC rod industry show a decline in most financial indicators during 1985, followed by consistent upward movement thereafter." *Suramerica,* 818 F.Supp. at 357. The court further attributed "the health of the rod industry" to rising demand catching up with shrinking capacity, the result of large-scale industry rationalization after the United States became completely electrified in the early 1980's. *Id.* at 355–57. The domestic industry has remained consistently profitable. *Id.* at 357.

The record provides at best limited support for ITC's interpretation of the condition of the domestic industry as "improving but still vulnerable." ITC employed data from 1984, the time of a cyclical high in the domestic EC rod industry, *id.* at 356, as its benchmark in assessing the condition of the U.S. industry. Furthermore, ITC itself acknowledged that the financial data on which it relied was "limited in value" because most domestic EC rod is produced by vertically integrated manufacturers who consume the

EC rod internally. *Threat Determination,* 1988 ITC LEXIS 64, at *10. Thus ITC's conclusion rests on incomplete data compared to an inappropriate benchmark. The domestic EC rod industry does not appear to be particularly susceptible to injury by reason of Venezuelan imports.

### 7. Other Demonstrable Adverse Trends (Section 1677(7)(F)(i)(VII))

ITC asserted that the European Economic Community (EEC), another export market for the Venezuelan industry, has a quota system with dramatically increased tariffs for imports beyond the limit. Venezuela "reportedly" had already exceeded its quota for 1988. *Threat Determination* at *20 n. 44. Southwire and ITC contend on appeal that the EEC quota might cause Venezuelan producers to divert imports to the United States and threaten domestic industry.

The Court of International Trade found that ITC relied on information without proper substantiation and ignored a letter the Venezuelan producers offered in rebuttal. *Suramerica,* 818 F.Supp. at 371. Even assuming the accuracy of the tariff information, however, it shows no more than a possible motive for Venezuelan producers to increase their imports to the United States. This record evidence does not show an imminent threat of material injury.

### 8. Industry Views

One domestic EC rod industry member, Alcoa, affirmatively opposes these petitions. *Suramerica,* 818 F.Supp. at 361. The others neither have experienced nor expect negative effects on their EC rod business as a result of Venezuelan imports. *Id.* at 366. Thus, those with the greatest stake in competition with foreign producers have not publicly indicated that they perceive imports as threatening.

Even the private explanations of members of the industry for their reluctance to support Southwire's petition do not negate the Court of International Trade's conclusion that the industry perceives no imminent threat. Two do not support the petitions even privately. Two others stated that they

988

might support the petitions, had they not chosen to put other corporate interests first. Corporations threatened with material injury, however, would hardly place other corporate priorities ahead of survival. These other superseding priorities suggest that these domestic industry members do not perceive a real and imminent threat of material harm.

### 9. Views of Other Interested Parties

The Court of International Trade correctly considered the views of interested domestic parties outside the EC rod industry as relevant to whether the industry faces a threat of material injury. *Suramerica*, 818 F.Supp. at 361–63. Southwire challenges the credibility of the outside parties. This objection goes to the weight and not the relevance of their views. ITC erred by ignoring them.

### 10. Summary

The lack of significant support for the petitions and the equivocal evidence as to the factors listed in the statute are not substantial evidence that the domestic EC rod industry faces a real threat of imminent material injury. The Court of International Trade correctly overturned ITC's threat determination for lack of substantial evidence.

### III.

On remand, ITC rescinded its threat determination without adding to the record. The record does contain substantial evidence supporting this rescission. The Court of International Trade correctly affirmed ITC's rescission of its threat finding.

### CONCLUSION

Given the lack of record evidence that imports of Venezuelan EC rod pose an imminent threat to the domestic industry, the Court of International Trade was correct to reverse and remand the ITC determination of threat of material injury. The Court of International Trade was also correct to affirm ITC's subsequent rescission of its threat determination.

### COSTS

Each party shall bear its own costs.

AFFIRMED.

